CALIFORNIA ET AL. *v.* LO-VACA GATHERING
CO. ET AL.

No. 46.   Argued November 17–18, 1964.—Decided January 18, 1965.*

*Richard E. Tuttle* argued the cause for petitioners in
No. 46.   With him on the briefs were *J. Calvin Simpson*
and *John T. Murphy.*

*John Ormasa* argued the cause for petitioners in No. 47.
With him on the brief was *Milford Springer.*

*Richard A. Solomon* argued the cause for petitioner in
No. 57.   With him on the brief were *Solicitor General*

*Together with No. 47, *Southern California Gas Co. et al.* v.
*Lo-Vaca Gathering Co. et al.*, and No. 57, *Federal Power Commission* v. *Lo-Vaca Gathering Co. et al.*, also on certiorari to the same
court.

Cox, Ralph S. Spritzer, Frank I. Goodman, Howard E. Wahrenbrock, Robert L. Russell and Peter H. Schiff.

Sherman S. Poland argued the cause for respondents. With him on the brief were Bradford Ross, C. Frank Reifsnyder and Hugh Q. Buck.

Harry L. Albrecht filed a brief for the Independent Natural Gas Association of America, as amicus curiae, urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

El Paso Natural Gas Co. is an interstate natural gas pipeline company that delivers gas at the Arizona-California border to three California distribution companies. The present controversy concerns gas to be purchased by it in Texas from Lo-Vaca Gathering Co. and Houston Pipe Line Co. Under Lo-Vaca's contract gas produced in Texas is to be delivered to a subsidiary of El Paso's at a Texas point for delivery into its pipeline. The contract contains the following two clauses:

> "All of the gas to be purchased by El Paso from Gatherer [Lo-Vaca] under this agreement shall be used by El Paso solely as fuel in El Paso's compressors, treating plants, boilers, camps and other facilities located outside of the State of Texas. It is understood, however, that said gas will be commingled with other gas being transported in El Paso's pipe line system."

> "It is the intent and understanding of the parties hereto that the sale of natural gas hereof is not subject to the jurisdiction of the Federal Power Commission because this sale is not for resale."

This "restricted use" agreement provides for a separate metering of the contract volumes prior to their delivery into El Paso's system. El Paso will meter the gas used

for fuel purposes in its New Mexico and Arizona facilities to make certain this amount invariably exceeds the volumes of gas taken from Lo-Vaca under this agreement.

El Paso and Houston made a similar contract containing a similar "restricted use" provision by which El Paso covenants that this Houston gas will be consumed by El Paso solely as fuel in its Texas operations or in another Texas plant. This contract, like the other one, also provides for metering the volume of gas delivered in Texas; and it includes a covenant by El Paso that the Texas uses will at all times exceed the amounts supplied by Houston.

In spite of these "restricted use" covenants it is conceded that the gas sold by Lo-Vaca and Houston to El Paso will flow in a commingled stream with gas from other sources and that at least a portion of the gas will in fact be resold out of Texas.

The Federal Power Commission asserted jurisdiction over these sales as sales in interstate commerce "for resale," as that term is used in § 1 (b) of the Natural Gas Act, 52 Stat. 821, 15 U. S. C. § 717 (1958 ed.).[1] 26 F. P. C. 606, rehearing denied, *id.,* at 840. The Court of

---

[1] Section 1 (b) of the Act provides:

"The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

Section 2 (7) of the Act reads as follows:

"When used in this Act, unless the context otherwise requires—

"(7) 'Interstate commerce' means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States."

Appeals reversed, one judge dissenting. 323 F. 2d 190. The case is here on a writ of certiorari. 377 U. S. 951.

We said in *Connecticut Co.* v. *Federal Power Comm'n,* 324 U. S. 515, 529, "Federal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental, test." And that is the test we have followed under both the Federal Power Act and the Natural Gas Act, except as Congress itself has substituted a so-called legal standard for the technological one. *Id.,* at 530–531. In *Interstate Natural Gas Co.* v. *Federal Power Comm'n,* 331 U. S. 682, 687, we considered the anatomy of the pipeline system to discover the channel of the constant flow; again in *Federal Power Comm'n* v. *East Ohio Gas Co.,* 338 U. S. 464, 467; and most recently in *Federal Power Comm'n* v. *Southern Cal. Edison Co.,* 376 U. S. 205, 209, n. 5. The result of our decisions is to make the sale of gas which crosses a state line at any stage of its movement from wellhead to ultimate consumption "in interstate commerce" within the meaning of the Act.

Attempts have been made by one convention or another to convert a local transaction into one of interstate commerce (*Sprout* v. *South Bend,* 277 U. S. 163; *Superior Oil Co.* v. *Mississippi,* 280 U. S. 390) or to make a segment of interstate commerce appear to be only intrastate (*Baltimore & Ohio R. Co.* v. *Settle,* 260 U. S. 166). But those attempts have failed. Similarly, we conclude that when it comes to the question what gas is for "resale" the present contracts should not be able to change the jurisdictional result.

The fact that a substantial part of the gas will be resold, in our view, invokes federal jurisdiction at the outset over the entire transaction. Were suppliers of gas and pipeline companies free to allocate by contract gas from a particular source to a particular use, havoc would be raised with the federal regulatory scheme, as it was con-

strued and applied in *Phillips Petroleum Co. v. Wisconsin*, 347 U. S. 672. A pipeline would then be able to discriminate in favor of its "nonjurisdictional" customers. Moreover, a pipeline company by a contract clause could immunize a particular supplier from the reach of federal regulation [2] as defined by *Phillips Petroleum Co. v. Wisconsin, supra.* There would be created in those and in other ways an "attractive gap" in the federal regulatory scheme (*Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1, 28) which the producing States might have little incentive to close, since the gap would often involve either lower costs to intrastate customers or else merely higher pipeline costs which ultimately would be reflected in rates paid by consumers in other States. Whether cases could be conjured up where in spite of original commingling there might be a separate so-called nonjurisdictional transaction [3] of a precise amount of gas not-for-resale [4] within the meaning of the Act is a question we need not reach.

---

[2] The Commission's Report, Statistics of Natural Gas Companies—1962, shows that the 40 major natural gas pipeline companies consumed more than $85,000,000 worth of gas in operating their facilities (principally compressor stations), p. xviii. This represents almost 4% of the total gas-purchase-costs of those companies. The Commission therefore points out in its brief that pipeline companies, merely by using "restricted use" controls, could without changing their actual operations create a substantial unregulated market for the benefit of particular producers. .

[3] Our reference in *Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1, 4, to "direct" sales of gas to industrial users as nonjurisdictional sales is not dispositive of the present issue. For the Commission had refused a certificate for transportation of the gas because from the standpoint of conservation it considered the end use as boiler fuel to be inferior. Whether the Commission had authority to assert jurisdiction over the so-called "direct" sale because it was "for resale" as a result of its commingling with other gas was not in issue.

[4] Cf. *United States v. Public Utilities Comm'n*, 345 U. S. 295, 317–318; *City of Hastings v. Federal Power Comm'n*, 221 F. 2d 31.

Finally it is said that the Commission should draw the appropriate lines between "jurisdictional" and "nonjurisdictional" sales through the use of its rule-making power. But we cannot say that the adjudicatory process is not an appropriate method for drawing the line case-by-case (*United States* v. *Public Utilities Comm'n,* 345 U. S. 295) as in a host of other administrative determinations. The Commission has acted responsibly in this situation and its decision must be upheld.

*Reversed.*

MR. JUSTICE WHITE took no part in the consideration or decision of these cases.

MR. JUSTICE HARLAN, dissenting.

Today's decision furnishes a too-ready answer to an intricate problem of administrative regulation. It reflects the sort of decision that is to be expected when the Court is willing to make a bare choice between two unrefined points of view as to regulatory method, without first being informed by the regulating agency concerned as to its evaluation of the competing factors—something that is indispensable to achieving a well-balanced solution of a problem such as this. The respective positions of the parties here each possesses the capacity to frustrate the scope of natural gas regulation ordained by the Congress. The Commission's molecular theory, accepted by the Court with undefined reservations, results in expanding the regulatory scheme by sweeping within the Commission's authority gas that has not been supplied or used for interstate resale ("nonjurisdictional" gas). The respondents' contract-allocation position, on the other hand, might serve to contract the legitimate scope of regulation by interfering with the ability of the Commission to deal with gas restricted under a supply contract to

"not-for-sale," but which has been actually used by the pipeline-purchaser for interstate resale ("jurisdictional" gas).

Whether or not there is a middle ground that would more closely fulfill the purposes of the Natural Gas Act than either of the proposals now before us is something that this Court is not competent to assess without expert guidance from the Commission, and we have been given none. Lacking this, I am unwilling to accept at this juncture the position of either party to this litigation. I think the Court should decline to pass upon these cases until the Commission has first illumined the regulatory problems involved through an appropriate exercise of its rule-making powers.[1]

The complexity and elusiveness of the matters with which we are asked to deal are best exposed from the vantage point of this Court by considering some of the questions to which allocation contracts in varying contexts give rise.

The Commission has, at least until this case, accepted the proposition that a single supplier to a pipeline may allocate by contract between the amount of gas used for jurisdictional purposes and the amount used nonjurisdictionally. For example, in *City of Hastings* v. *Federal Power Comm'n,* 221 F. 2d 31, a pipeline company sold gas to the city through one pipeline under two contracts, one covering the gas to be resold by the city, and the other gas to be used by the city in its own plants. Although the gas was mingled in the common pipeline, the allocation was approved, and the latter gas was, without more, considered not subject to Commission regulation. A similar situation was presented in *United States* v. *Public Utilities Comm'n of California,* 345 U. S. 295, where a power company sold electricity to the Navy for

---

[1] See Elman, Comment, Rulemaking Procedures in the FTC's Enforcement of the Merger Law, 78 Harv. L. Rev. 385 (1964).

use in its power plants and also for resale to dependent families. The absence of any allocation was fatal in that case, but the Court recognized that a different question would be presented if there had been two separate transactions. 345 U. S., at 316–318.

The result does not change when two or more suppliers are involved, provided that the allocation of nonjurisdictional gas is prorated among all of the suppliers. For example, if a pipeline company consumed 30% of its total volume of gas in its own plants, and sold 10% of the total volume in the State of production, each supplier could allocate 40% of its gas supply to nonjurisdictional use. Such was essentially the case in *North Dakota* v. *Federal Power Comm'n*, 247 F. 2d 173, where the allocation was upheld with Commission approval. If these cases are accepted by the Court, two corollaries follow: since gas is a fungible commodity, the mingling of gas does not alone render ineffective for purposes of Commission jurisdiction the allocation contracts, although the molecular identification of the nonjurisdictional gas is destroyed; and the fact that the prices paid for nonjurisdictional gas [2] may affect the rate base for the jurisdictional gas, is also not a critical factor at this stage.[3]

---

[2] See Court's opinion, *ante*, p. 370. In fact, the price charged by Lo-Vaca for its nonjurisdictional gas is exactly the same as the price established for its concededly jurisdictional sale, and the Houston sale is for a price lower than either of the Lo-Vaca sales.

[3] Both Lo-Vaca and El Paso are constructing pipelines to connect with the El Paso system at its Coquat station, and both must obtain Commission certification under § 7 of the Natural Gas Act in order to construct such pipelines. The Commission could take many of the factors presented in this case into account when ruling on the applications, see *Federal Power Comm'n* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1. The Commission could also take into account the reasonableness of the prices charged for nonjurisdictional gas should El Paso apply for a rate increase on its jurisdictional sales.

The issue now before the Court arises only when some suppliers are allocating part or all of their gas to nonjurisdictional use, but others are not. This issue could arise commonly in two contexts: if existing suppliers were allocating pro rata, and new suppliers were added which did not allocate, the addition of the new suppliers might be thought not to destroy the validity of the existing allocation contracts since the new suppliers might be satisfying an increase in the demand for jurisdictional gas.[4] The converse situation is presented in this case, where the new suppliers are attempting to allocate, and existing suppliers are not. One possible test in such cases might be to determine the source of the demand for the gas supplied to El Paso by Houston and Lo-Vaca. To modify the argument used by respondents, if a separate pipeline were constructed from the Coquat station (at which the gas enters the El Paso system) to the point along El Paso's system where the outflow will increase, would the sale be jurisdictional or not? If in fact El Paso has formerly been using the same amount of gas in its compressors that it intends to use in the future, then the purpose of the Lo-Vaca allocation will be merely to release for interstate sale—to satisfy the interstate demand— gas from other suppliers which formerly was used for nonjurisdictional purposes.

The record before us does not answer the question put. There is some indication that El Paso intends to construct new compressor plants, and may have to use more nonjurisdictional gas at its existing plants to handle the added gas received from Lo-Vaca under the unrestricted contract. Such a use would satisfy a nonjurisdictional de-

---

[4] See *Amerada Petroleum Corp.* v. *Federal Power Comm'n,* 334 F. 2d 404 (C. A. 8th Cir. 1964), cert. pending, No. 585, this Term, where the suppliers in the *North Dakota* case, *supra,* had been allocating, and the pipeline then added new suppliers which did not allocate. The Court of Appeals upheld the allocation contracts.

mand. However, there is also evidence that in fact El Paso's consumption for nonjurisdictional purposes will remain constant, and that Lo-Vaca's supplies will be used to satisfy an increased demand from interstate consumers. The fact that Lo-Vaca gas purportedly replaces the compressor gas supplies formerly furnished by other suppliers, thus releasing that gas for interstate resale, should not defeat Commission jurisdiction under this analysis.

Another possible standard which suggests itself would. be to determine the probable percentages of gas from each supplier which will be used for nonjurisdictional purposes, and only permit each supplier to allocate by contract to nonjurisdictional use his pro rata share of the total estimated nonjurisdictional gas. For example, if we suppose a pipeline running from the Gulf coast of Texas through New Mexico into California, as does the El Paso system, then each supplier should determine what percentage of . the total volume of gas flowing west from the point of its input will be ultimately used for a nonjurisdictional purpose. It would then be mathematically probable that his gas would be used for nonjurisdictional purposes in the · same percentage, and he could allocate that amount by contract, subject to change should new supplies be added to the system.[5]

I recognize, of course, that there may be pitfalls in both of these possible methods, and that there may be other, formulae that are preferable to either. I have ventured

---

[5] Corrections would have to be made, of course, where gas is withdrawn for intrastate consumption from a trunk line before the gas is mingled with the interstate system. Such gas would all be attributed to the suppliers feeding the trunk line, and this gas would not be used in computing the total percentages. Cf. *Peoples Natural Gas Co. v. Public Service Comm'n of Pennsylvania,* 270 U. S. 550. This method of allocation would only operate with natural gas, which flows in one direction only; different considerations would be applicable were we dealing with electric power, which can flow in both directions along a system.

them only as support for my belief that the Commission's molecular theory, which in the name of protecting the Commission's jurisdiction in reality involves a judicial expansion of its authority, should not be accepted until the Commission, after due exploration in a rule-making proceeding, is able to satisfy this Court that no other feasible method—more particularly no modification of the respondents' contract-allocation theory—exists that would better fit the boundaries of the Commission's jurisdiction as fixed by Congress.

It is undoubtedly true that normally an administrative agency may decide for itself whether to proceed in a given field of its regulatory functions through the promulgation of general rules [6] or by the process of case-by-case adjudication.[7] This Commission from the outset has usually proceeded, with the Court's approval,[8] in developing its procedures by the adjudicatory process. Nevertheless, there are good reasons why the rule-making power appears to be the more promising avenue of approach in this instance. *First,* the adjudicatory process has not yielded any satisfactory basic principle to serve as a point of departure for judicial assessment of cases of this kind, or indeed for a consistent administrative approach; [9] even in this litigation the Commission's position is far from clear as to what room, if any, there may be for restrictive allocation contracts. *Second,* the gas industry is entitled to know the fundamental ground rules by which it should

---

[6] See *United States* v. *Storer Broadcasting Co.,* 351 U. S. 192. See generally 1 Davis, Administrative Law Treatise, § 5.01 (1958).

[7] See *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194.

[8] See, *e. g., United States* v. *Public Utilities Comm'n of California, supra,* at 318, n. 28.

[9] See *Lo-Vaca Gathering Co.,* 26 F. P. C. 606, 615:

"To the extent that *North Dakota* may be inconsistent with the action we take here, we believe it was erroneously decided." Compare, *supra,* p. 373.

conduct itself in this regard with some degree of predicta-
bility, as witness the situation of these respondents whose
good faith in the transactions giving rise to this litigation
has not been impugned in any way.  *Third,* that unlike
the line of cases in which agency jurisdiction is con-
ceded,[10] here the Commission should not be permitted to
adopt a theory which expands its jurisdiction beyond
statutory limits [11] without full hearings and the formula-
tion of a rule interpreting its jurisdiction in this area
which conforms to the jurisdictional limits of § 1 (b) of
the Natural Gas Act.  *Fourth,* because these matters are
fraught with technical "perplexities, both geological and
economic," *Railroad Comm'n of Texas* v. *Rowan &
Nichols Oil Co.,* 311 U. S. 570, 574, the informed exper-
tise of the Commission is a necessary adjunct to satis-
factory judicial resolution of particular cases.  "Had the
Commission, acting upon its experience and peculiar com-
petence, promulgated a general rule of which its order here
was a particular application, the problem for our consid-
eration would be very different."  *Securities & Exchange
Comm'n* v. *Chenery Corp.,* 318 U. S. 80, 92.  The courts
have a right to the informed judgment of the Commission
before acting further in this presently opaque area.

I would vacate the judgment of the Court of Appeals
and remand the case to the Commission for further pro-
ceedings after the promulgation of interpretive rules to
cover this, and like cases.[12]

---

[10] As for example, in rate-making proceedings.

[11] Natural Gas Act, § 1 (b), quoted in the Court's opinion, *ante,*
p. 368, n. 1.

[12] See *Addison* v. *Holly Hill Fruit Prods., Inc.,* 322 U. S. 607, 619.