**SECRETARY OF the ARMY, Petitioner,**

v.

**FEDERAL POWER COMMISSION,**
**Respondent.**

No. 22675.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 11, 1969.

Decided Dec. 12, 1969.

Petition for Rehearing Denied
Jan. 20, 1970.

Mr. Stephen R. Felson, Atty., Department of Justice, with whom Mr. Alan S. Rosenthal, Atty., Department of Justice, was on the brief, for petitioner.

Mr. Israel Convisser, Attorney, Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel at the time the brief was filed, Peter H. Schiff, Solicitor, and Robert L. Russell, Asst. General Counsel, Federal Power Commission, were on the brief, for respondent.

Before TAMM, LEVENTHAL and ROBB, Circuit Judges.

TAMM, Circuit Judge:

In this petition the Secretary of the Army seeks to set aside an order of the Federal Power Commission rejecting the Army's contention that all of the natural gas used in the Vint Hill Farms military reservation should be subject to the Commission's jurisdiction under the Natural Gas Act. Our review reveals substantial inadequacies in the findings compiled by the Commission, and thus we remand for further proceedings.

## I. THE FACTUAL CONTEXT

On December 3, 1965, the Secretary of the Army applied to the Federal Power Commission pursuant to section 7(a) of the Natural Gas Act [1] for an order directing the Atlantic Seaboard Corporation (hereinafter "Seaboard") to sell the Army the natural gas needed in operating the Vint Hill Farms military reservation in Warrenton, Virginia. Seaboard is a Delaware corporation engaged in the interstate transmission of natural gas; its main transmission line runs through the Vint Hill reservation and connects near the boundary of the facili-

---

1. 15 U.S.C. § 717f(a) (1964):
   Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to * * * sell natural gas to, any person * * * engaged * * * in the local distribution of natural or artificial gas to the public * * *.

ty with metering and regulating devices operated by Virginia Gas Distribution Corporation ("Virginia Gas"), an affiliate of Seaboard [2] which sells natural gas to the public in Virginia. The gas used at the Vint Hill station is taken from the Seaboard pipeline at that point and delivered to the Army's distribution system through a twenty-two foot pipe owned by Virginia Gas. Some of the gas thus purchased by the Army is admittedly resold within the meaning of the Act, although the exact proportion is in dispute; the remainder is direct-use gas consumed in the operation of military facilities on the base.

The Army's purpose in seeking this order was, simply stated, to eliminate the middleman, Virginia Gas. The Army took the position that Virginia Gas performed no services meriting compensation other than providing the short length of connecting pipe; in addition, the Army contended that because part of the gas being used at Vint Hill was destined for resale and thus subject to Commission regulation, all of the gas in the commingled stream would be "jurisdictional" or subject to federal rate regulation; cf. California v. Lo-Vaca Gathering Co., 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965). Power to regulate "direct-use" sales of natural gas to the ultimate consumer is expressly reserved to the States by section 1(b) of the Natural Gas Act,[3] but the State of Virginia does not assert jurisdiction over sales to federal instrumentalities; as a result of this regulatory gap, the Army contends, it is forced to pay over $50,000 per year more than it would be if the entire stream of gas entering the Vint Hill distribution system were subject to federal rate-making jurisdiction.

After conducting a hearing on the Army's application, an examiner ruled that the Commission lacked power under section 7(a) of the Natural Gas Act to compel Seaboard to sell the Army any gas that was not to be resold within the meaning of the Act; since the Army had not supplied an estimate of the amount of gas destined for resale, as required by Commission regulations,[4] the Army's application was denied without prejudice. The Commission adopted the examiner's view of the jurisdictional question, and remanded the proceeding to the examiner with directions to reopen the record so that the Army would have an opportunity to comply with the applicable regulation requiring an estimate of the quantity of gas destined for resale (J.A. 24a–33a). The Army's petition for a rehearing was denied by the Commission on November 25, 1968 (J.A. 39a–42a), and this petition resulted.

## II. COMMINGLING AND COMMISSION JURISDICTION

The Commission's decision that it does not have jurisdiction over all of the gas involved in the instant transactions rests on the plausible argument that a contrary result would create a conflict between section 7(a) of the Act and the provisions in section 1(b) reserving state control over direct-use sales of natural gas:

> Were we to direct Atlantic Seaboard to make available to the Army any more gas than that which is resold, we would quite plainly be directing an interstate pipeline to make a direct industrial sale at a regulated rate. We need not belabor the fact that we have no authority so to act. Clearly, Congress intended to distinguish between

---

2. Both Seaboard and Virginia Gas are wholly-owned subsidiaries of the Columbia Gas System, Inc.

3. 15 U.S.C. § 717(b) (1964):
   The provisions of this chapter shall apply * * * to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any

other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

4. 18 C.F.R. § 250.6 (1969).

resales and direct consumptive sales and to reserve the prerogatives of the state and local authorities over the latter.

(J.A. 29a.) However, it is obvious that one tacit premise of this rationale is the assumption that Seaboard does not presently sell gas directly to the Army, but rather sells only to Virginia Gas.[5] This characterization of the transaction is clearly at odds with the following language in the examiner's initial decision:

> [T]he Army did make a *prima facie* case that the gas in issue is supplied directly by the wholesaler (Seaboard). The distributing company (Virginia Gas) furnishes minor facilities (a 22-feet [*sic*] pipe) and does a single billing, while the Army, perhaps for its own convenience, performs all the other normal functions of a gas distribution company. Respondent [Seaboard] failed to rebut said allegations. It presented no contradictory evidence, but merely rested on a general contention that as a matter of law the Army just cannot truly be in the utility business. Yet as a matter of fact the Army comes close to being a Distributor of gas at Vint Hill Farms Station.

(J.A. 21a–22a.) The Commission's decision does not articulate any reason for ignoring or rejecting this description of the transactions; yet, it seems clear that a finding that Seaboard sells directly to the Army could well affect the outcome of the controversy.

As a general matter, the question of whether the Federal Power Commission can and should assert regulatory authority over transactions involving commingled "jurisdictional" and "nonjurisdic-tional" gas is fraught with difficulty, and hedged by rather artificial distinctions. Much of the confusion surrounding this question arises from the need to implement the Congressional decision that authority should be divided between the states and the federal government in regulating transactions in a fungible commodity which moves in a generally continuous stream from producer to ultimate consumer. The Supreme Court dealt with one aspect of this problem in California v. Lo-Vaca Gathering Co., 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965). In *Lo-Vaca*, the gathering company contracted to sell natural gas to an interstate pipeline company for direct use; the gas was measured before delivery, then commingled by the pipeline company with resale gas during transportation to the point of use outside the state, where it was again metered. In these circumstances the Supreme Court ruled that "[t]he fact that a substantial part of the [commingled] gas will be resold * * * invokes federal jurisdiction at the outset over the entire transaction." 379 U.S. at 369, 85 S.Ct. at 488.

*Lo-Vaca* can be distinguished from the instant case, provided that Seaboard in fact makes no direct sales to the Army; if this condition were clearly demonstrated in the record, it would be possible to conclude that Seaboard has not participated voluntarily in any transaction which necessarily involves commingling of jurisdictional and nonjurisdictional gas. On the other hand, if the examiner's finding quoted above implies that the interposition of Virginia Gas is merely a sham, devoid of economic substance and designed to avoid federal regulation,[6] it becomes much more difficult to distinguish *Lo-Vaca*.[7] There would

---

5. *See, e. g.*, J.A. 32a, where the Commission places great emphasis on the fact that "there is not even a present contractual relationship between Army and Seaboard."

6. *Cf.* Public Service Elec. & Gas Co. v. FPC, 371 F.2d 1, 4–5 (3d Cir. 1967), where the court examined the economic and legal substance of a transportation agreement involving commingling, and concluded that it was really a bailment of a fungible commodity (gas) rather than a sale and repurchase.

7. The *Lo-Vaca* opinion suggests several possible distinctions which could be relevant to this controversy. For example, that decision emphasizes "[t]he fact that a *substantial* part of the [commingled]

also be strong policy reasons for favoring federal regulation under these circumstances. Since it could be said that Seaboard had voluntarily placed itself in a position in which it was actually supplying commingled jurisdictional and nonjurisdictional gas directly to the Army, the element of compulsion inherent in the normal section 7(a) order would be absent and any incursion on state regulatory policy would presumably be slight; at the same time, assertion of federal jurisdiction would avoid the "attractive gap" in the regulatory scheme which results from Virginia's decision not to control rates charged to federal instrumentalities. The suggestion that state motivation to abstain from regulating a given type of transaction constitutes a proper premise for the assertion of federal jurisdiction can be found in FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 19–20, 81 S.Ct. 435, 445, 5 L.Ed.2d 377 (1961) (emphasis in original):

> When Congress enacted the Natural Gas Act, it was motivated by a desire "to protect consumers against exploitation at the hands of the natural gas companies." * * * To that end, Congress "meant to create a comprehensive and effective regulatory scheme." * * * It is true, of course, that Congress did not desire comprehensive *federal* regulation; much authority was reserved for the States. But, it is equally clear that Congress did not desire that an important aspect of this field be left unregulated. * * * Therefore, when a dispute arises over whether a given transaction is within the scope of federal or state regulatory authority, we are not inclined to approach the problem negatively, thus raising the possibility that a "no man's land" will be created. * * * That is to say, in a borderline case where congressional authority is not explicit we must ask whether state authority can

practicably regulate a given area and, if we find that it cannot, then we are impelled to decide that federal authority governs.

*Lo-Vaca* extends this rationale closer to the facts of the instant controversy, for there it is indicated that the federal interest in asserting jurisdiction is strong when one state can pass on higher costs to the citizens of other states by failing to regulate the transactions in question (379 U.S. at 370, 85 S.Ct. 486). That is exactly what the Army contends is happening at Vint Hill: the more that the federal government is charged for gas used at Vint Hill, the less justification Virginia Gas will have for raising the rates charged to its customers in state-regulated sales. In essence, federal taxpayers may be helping to subsidize the cost of gas services for citizens of Virginia.

It may well be true, as Mr. Justice Harlan concluded in his dissent to *Lo-Vaca*, that complex jurisdictional problems of this kind can be satisfactorily resolved only by legislation or administrative rule-making. (*See* 379 U.S. at 371–377, 85 S.Ct. 486.) In any event, if the Commission continues to evolve standards in this area through use of the adjudicatory process, it must provide reviewing courts with a record which adequately treats all of the complex legal, factual, and policy issues involved. In order to remedy the deficiencies in the record outlined above, the Commission's order must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

LEVENTHAL, Circuit Judge (dissenting).

The court errs, I think, in remanding because of a supposed insufficiency of the present record in the possibility that

---

gas will be resold" (379 U.S. at 369, 85 S.Ct. at 488; emphasis added), thus raising the possibility that there is a *de minimis* exception to *Lo-Vaca* when very small amounts of jurisdictional gas

are in issue. Obviously, it is difficult to evaluate this argument on review without the benefit of a Commission discussion of the practicability and ramifications of such a distinction.

the sales by Atlantic Seaboard Corp. ("Seaboard") to its affiliate Virginia Gas Distribution Corporation ("Virginia Gas") "is merely a sham." That idea was not urged by the Army in support of its application, nor urged in the petition for rehearing, which defines the area of subsequent judicial review, as a reason for reconsideration.[1]

In my view this case calls for application of the doctrine that where the presentation of issues in the record, and the basis of the agency's determination of them, can be discerned with reasonable clarity, its order should be affirmed if the disposition is in accordance with the applicable statute and rules of administrative procedure.[2]

The order before us is the denial in part of an application filed by the Army under § 7(a) of the Natural Gas Act, 15 U.S.C. § 717f(a). The application sets forth the following: (1) The Army is "engaged in the distribution and sale of natural gas within the boundaries of the military reservation (Vint Hill Farms Station)." (2) It "presently purchases all of its gas from Virginia Gas," which is engaged in gas distribution wholly within Virginia. (3) The gas is being delivered from the main of Seaboard, a company engaged in interstate transmission of natural gas, through a small line (some 20-odd feet of 2-inch pipeline). (4) "Applicant seeks the direct delivery and sale by Seaboard to Applicant at an interconnection of Applicant's distribution system."

The Army not only seeks to obtain the gas from Seaboard, but to buy it at the same tariff schedule as applies to Seaboard's sales to Virginia Gas, i. e. Seaboard's CDS-1 resale schedule.

The Commission found that Seaboard makes no direct sales and has no separate tariff for such sales.

Section 7(a) of the Act authorizes the Commission to "direct a natural-gas company to * * * sell natural gas to any person or municipality engaged or legally authorized to engage in the local distribution of * * * gas to the public * * *."

The Commission held, contrary to various contentions of Seaboard and the Staff, that the Secretary of the Army was a person eligible to invoke § 7(a). It held that the Army was engaged in distribution to the "public," albeit a limited public, as to the gas sold by the Army to tenants, concessionaries or social groups located on the reservation. The Commission held that the Army would be entitled to an order under § 7(a) directing Seaboard to supply this gas to the Army, and to do so at its resale rate.[3]

The Commission reached a different result, however, as to gas purchased by the Army for government use and not for resale. The Army concedes that "some of the gas purchased is used directly for Army facilities," (Br. 3). This concession apparently applies to more than half the Army's requirements. There is a dispute as to the proper classification of some 40% of its requirements.[4] The proper resolution of the

---

1. I may add, in passing, that I see nothing offensive in a large system organizing itself in separate companies, one or more for interstate transmission, and a separate one for distribution in each state.

A regulated corporation devotes considerable time to compliance with regulatory requirements, and organization by regulatory jurisdiction, so that each management specializes in a particular set of requirements, seems sensible.

2. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); WAIT Radio v. FCC, 135 U.S.

App.D.C. 317, 418 F.2d 1153; Pikes Peak Broadcasting Co. v. FCC, 137 U.S.App. D.C. 234, 422 F.2d 671, March 24, 1969.

3. This aspect of the case requires completion of certain filings by the Army. The Examiner decided that its application should be denied without prejudice to renewal. The Commission remanded with directions to reopen the record to permit the Army to satisfy the regulatory requirements.

4. The Army contends that it was engaged in reselling gas to Defense Intelligence Agency (which has facilities on the sta-

classification of those sales is not discussed by the majority, and I will note only briefly, without discussion, that to me the FPC's disposition seems reasonable at least if it reflects general doctrine, that a sale to an affiliate for consumption is not a sale for resale.

As to gas purchased by the Army for use rather than resale, the Commission relies on § 1(b) of the Act and the historic and reiterated distinction between sales for resale and sales for direct use.[5] Section 1(b) defines the Commission's authority in terms of either transportation in interstate commerce, or "the sale in interstate commerce of natural gas for resale." 15 U.S.C. § 717. In Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 516–517, 68 S.Ct. 190, 195, 92 L.Ed. 128 (1947), Justice Rutledge said that the statute, with "unusual legislative precision," "cut sharply and cleanly between sales for resale and direct sales for consumptive uses." "Direct sales for consumptive use of whatever sort were excluded [from the application of the act]." The Court held that in the light of the history, provisions and policy of the Act, sales by an interstate carrier direct to consumers, were subject to state regulation even though the sales were in interstate commerce.

The withdrawal from the scope of the federal Act of sales by interstate carriers direct to consumers has given rise to temptations and problems, notwithstanding the availability of state regulation. The Commission has expressed the view that Congress should extend its jurisdiction to reach those sales,[6] but no change has been made.

The Army invokes as a cross-cutting principle the concept of commingling as a basis for extension of Federal authority. The contention is that where a person receiving the gas takes a delivery that commingles both gas covered by the Act (the gas purchased for resale) and gas outside the Act (gas directly purchased by consumer), Federal jurisdiction extends to all the gas involved.

The Army relies on California v. Lo-Vaca Gathering Co., 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965). On an interstate pipeline's purchase of gas in Texas, Commission jurisdiction was conceded as to gas resold in other states. It was contended that where the contract between the producer and pipeline identified certain gas as disposed of within the producing state, or not resold at all (used by the company itself), the Commission could not exercise jurisdiction. The Court stated (379 U.S. at 369–370, 85 S.Ct. at 488–489):

> The fact that a substantial part of the gas will be resold, in our view, invokes federal jurisdiction at the outset over the entire transaction. * * * [A contrary result would create] an "attractive gap" in the federal regulatory scheme (Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 28, 81 S.Ct. 435, 449, 5 L.Ed.2d 377) which the producing States might have little incentive to close, since the gap would often involve * * * lower costs to intrastate customers * * * Whether cases could be conjured up where in spite of original commingling there might be a separate so-called nonjurisdictional transaction of a precise amount of gas not-for-resale within the meaning of the Act is a question we need not reach.

The Army invokes the "attractive gap" principle by stating that Virginia "does not regulate the sale of gas to federal

---

tion) and to Defense Family Housing (which has quarters occupied by individuals who use the gas for cooking, and space and water heating). The Commission concluded these were not "sales" in the jurisdictional sense of sales to the public, but rather intra-Defense Depart-

ment accounting transactions for the convenience of the military.

5. It relied on the discussion in Cities Service Gas Co., 35 F.P.C. 571 (1966).

6. *See* FPC Annual Reports for 1961–1965.

instrumentalities or to municipal corporations." [7]

Whether and to what extent the commingling principle of *Lo-Vaca* applies to sales by interstate pipelines may involve some interesting questions that must be faced in another case. The point was left open in *Lo-Vaca,* as noted in the last sentence of the extract quoted above. It is possible that the issue could come to turn on the "separateness" of sales in terms other than molecular. [8] A more realistic forecast is that the commingling principle will be extended to prevent any separation that realistically undercuts effective regulation of jurisdictional gas, and that can therefore be described as taking advantage of an "attractive gap" contrary to congressional intent.

In any event, I am ready to assume, at least for present purposes, that the commingling principle may have substantial reach where a pipeline sells to a purchaser for both purposes (for consumption and resale).

But here the Army has no relationship with Seaboard. It wants to establish one. [9] The Commission says that it can exercise authority under § 7(a) to require Seaboard to deliver gas that the Army wants for resale, whether Seaboard wants to or not. However, the Commission continues, Seaboard has the discretion to decline to enter into a relationship with the Army to supply gas desired by the Army for its own consumption, and the Commission does not have the authority to require such a new relationship. [10]

This view does not mean that the Commission is bound by the law to an arid rigidity. It has already gone at least as far, in its *Bushnell* case, as to assert its jurisdiction to compel a sale under § 7 (a), and to apply jurisdictional resale tariffs, in order to cover a sale to a distribution utility of gas needed for resale on peak days, even though in off-peak

7. Br. 3. It cites Va.Code Ann. § 56–265.1 (a), (b) (1969).

8. In *Lo-Vaca* the Court offered a "cf." citation to United States v. Public Utilities Commission, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020 (1953), where it did not follow a Court of Appeals opinion that such separation was impossible, and indicated that there might be a record that would identify separate "sales," one for resale and one for consumptive use (345 U.S. at 318, 73 S.Ct. 706).

9. It is not clear what the Examiner had in mind in saying "the Army did make a prima facie case that the gas in issue is supplied directly by the wholesaler (Seaboard)." The context was in the course of establishing that the Army qualified under § 7(a) as a gas distribution company to the extent that it obtained gas for resale.

   In any event, the pleadings, evidence, and Commission predicate are clear enough as to the salient facts and issues.

10. The Commission said:

   Here there is not even a present contractual relationship between the Army and Seaboard. We can, under Section 7(a) of the Act require Seaboard to sell gas directly to the Army—to the

extent the Army in turn resells it, but we have no authority to require Seaboard to make a direct sale to the Army for its own use. Seaboard can, consistent with its obligations under Section 7(a), separately contract to sell the Army the gas which the Army in turn resells, and continue to sell the remainder as Seaboard sees fit either through Virginia Gas or to the Army directly, pursuant to a new and separate contract. That Seaboard's present contract with Virginia Gas involves all of the Army's Vint Hill needs, both for consumption and resale, and that the Virginia Gas contract with the Army is equally unitary is irrelevant; we are not here concerned with the legal consequences of the present contractual situation but with that which would be in effect subsequent to an invocation of our powers under Section 7(a) of the Act.

   To hold that the Army, which has it within its power to separate these transactions, can by its refusal to do so, transform a direct sale into a sale for resale, would be unconscionable as a matter of equity and would be in direct contravention of the Natural Gas Act's prohibition of Commission jurisdiction over direct sales.

periods the gas not needed for resale might be consumed by the utility itself.[11]

In the present case, however, what is involved is an attempt by the Army to invoke § 7(a) to require an interstate pipeline to make a sale not merely of gas purchased for resale, and not merely of some gas that might somehow be swept along as an incident or necessary accompaniment of the gas purchased for resale,[12] but of an equal and even greater amount of gas purchased by applicant for direct consumption.

That is an attempt to obtain Federal involvement in sales by an interstate pipeline for consumption, that is unavailable under the Act as it stands.

Let me conclude with some overall perspective, at risk of repetition. *Lo-Vaca's* commingling rule prevents undercutting of effectiveness of the legitimate scope of Federal regulation. That was the case, as the Commission advised the Supreme Court, in purchase by a pipeline from producers; for if some of these could, by contract, be (conceptually) segregated from a single stream of gas through the pipeline the (jurisdictional) remainder simply could not be effectively regulated in a way that fulfilled the statutory standards of fairness to the consumer.

As to sales by a pipeline, the Commission has full statutory power to regulate sales to distributors—both by compelling such sales, even to the point of requiring line extensions, and by regulating the price. The commingling principle is available, if needed, to effectuate such

regulation of sales for resale. Neither the commingling doctrine nor any other is available for the purpose of protecting purchases not-for-resale, and that is the principal purpose of the appeal.[13] That protection was not desired or provided by Congress, which pointedly worded its statute so as to make clear that the Commission has no legitimate concern with pipeline sales to consumers. There are some who advocate Commission authority over direct consumptive sales as necessary, in global terms, for balanced and meaningful regulation of pipelines who sell to distributors, but that approach is not available under the statute as it stands. The Commission has no legitimate interest in regulating sales not-for-resale as such, and it does not need to regulate them in order to provide protection as to sales for resale.

There is no warrant for invoking the "attractive gap" principle. There is no gap here but only a line, with effective Federal regulation on one side of the line and full authority in the States on the other side. Congress has left to the States the regulation of sales to industrial consumers, and withdrawn any "gap" that might have existed as to sales to such consumers in interstate commerce. The only purpose of calling on the commingling principle would be to require and then extend regulatory protection to a sale (by pipeline to industrial consumer) that Congress wanted left to the States. In Virginia's regulatory scheme there may be a "gap," although that is by no means clear on the record,[14]

11. American Louisiana Pipe Line Co., Op. No. 402, 30 FPC 698; aff'd *sub nom.*, Central Illinois Public Service Company v. FPC, 338 F.2d 682 (7th Cir. 1964).

12. This might be justified as a kind of de minimis theory, blended with the point that it would frustrate meaningful application of § 7(a) if the Commission were required to bog itself down with proceedings concerning amounts of gas devoid of practical significance.

13. The Commission ruled in this case that it will take appropriate steps as to this pipeline's sales for resale, will order them made and at the standard tariff for sales to distributors.

The major portion of the gas purchased by the Army is for direct consumption—even assuming without deciding, that gas purchased for delivery to, say, Defense Intelligence Agency is for "resale."

14. I see nothing, *e. g.*, that says that Virginia Gas may lawfully charge the Army for gas that it consumes on a different basis than it charges, say, industrial consumers. All that appears in the record on any "gap" in state regulation is par. 8 of the application, stating: "Under Virginia Law, the State Corporation Commission has no jurisdiction over sales by public utilities to agencies of the Federal Government. Accordingly, no state

and it may well be that relief is available in court in an action lodged by the Army against the distributor or the state officials.[15] If there is a gap in regulating a distributor's sales to a consumer and it leads to abuse, the remedy lies in seeking a change from the legislature.

certificate is needed and none has been applied for." In context this follows immediately on par. 7, saying that no other application need be filed or franchise obtained in order to permit the service sought to be required under § 7(a).

The Army cites Va.Stat.Ann. § 56–265.1. This defines a "public utility" as a "company" that inter alia, sells gas for heat, light or power. It defines "company" as not including "a municipal corporation or county." This section is part of ch. 10.1, Utility Facilities Act, which requires a certificate of convenience and necessity from the state commission before a public utility may acquire facilities or furnish public utility service.

If a Federal instrumentality, like a municipal corporation, is not required to obtain a certificate in order to acquire facilities or render service that "gap" would seem to be a help to the instrumentalities rather than a hindrance.

15. It may be that, even assuming the state commission has no direct regulatory authority over a distributor's sales to Federal agencies, they can have recourse to a continuing common-law duty of a utility to serve all consumers without unreasonable discrimination. Discrimination against a Federal agency, or municipal authority, may be the more invidious and vulnerable because of public policy considerations, both those applicable to all government, and supremacy doctrines which safeguard the Federal Government in its various appearances within the State. These factors may even have constitutional reenforcement.