327 S.E.2d 444

**PENNZOIL COMPANY**

v.

**The PUBLIC SERVICE COMMISSION, The Consumer Advocate Division of the Public Service Commission.**

**PENNZOIL COMPANY**

v.

**The PUBLIC SERVICE COMMISSION.**

Nos. 16513, 16572.

Supreme Court of Appeals of West Virginia.

March 1, 1985.

Goodwin & Goodwin, C.E. Goodwin, Ripley, John B. Chapman, Baker & Botts, Bruce F. Keily, Kirk V. Van Tine, Washington, D.C., for appellant.

Richard E. Hitt, Public Service Com'n, Charleston, for Public Service Com'n.

Consumer Advocate Div. of PSC, Denise Goulet, Charleston, for Consumer Advocate Div.

MILLER, Justice:

The Pennzoil Company claims it is aggrieved by a final order of the Public Service Commission (PSC), holding that the PSC has authority to set the price of that portion of Pennzoil's West Virginia gas production which is sold to retail consumers in this State. Part of Pennzoil's production is transmitted in interstate commerce, but the PSC does not claim jurisdiction to set prices for this gas.

Pennzoil argues that as a result of a recent United States Supreme Court opinion, *Public Serv. Comm'n of New York v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983), and an order by the Federal Energy Regulatory Commission (FERC), the PSC has no jurisdiction to set pricing guidelines for West Virginia gas production sold to West Virginia retail customers. Pennzoil claims that under *Mid-Louisiana* and the FERC order its gas price is controlled solely by the Natural Gas Policy Act, 15 U.S.C. § 3301, *et seq.* (1978) (NGPA). We disagree.

*Mid-Louisiana* did not involve an attempt on the part of a state to regulate the price of gas produced and sold to retail customers within its borders. In *Mid-Louisiana*, certain interstate pipeline companies · complained that FERC, which is charged with issuing regulations under the NGPA, had promulgated two regulations excluding them in certain instances from the benefit of the higher prices available under the NGPA.

The United States Supreme Court concluded that FERC had too narrowly construed the coverage of the NGPA in excluding the pipeline companies from its benefits. The Court directed FERC to establish at what point the interstate pipeline company could get the benefit of the NGPA rates:

"The Commission's position is contrary to the history, structure, and basic philosophy of the NGPA. Like the Court of Appeals, we conclude that its exclusion of pipeline production is 'inconsistent with the statutory mandate [and would] frustrate the policy that Congress sought to implement.' *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32, 70 L.Ed.2d 23, [30,] 102 S.Ct. 38 [42] (1981). Unlike the Court of Appeals, however, we believe Congress intended to give the Commission discretion in deciding whether first sale treatment should be provided at the intracorporate transfer or at the downstream transfer." 463 U.S. at 342–343, 103 S.Ct. at 3037, 77 L.Ed.2d at 686. (Footnote omitted).

It is clear from *Mid-Louisiana*'s historical survey of the developments leading to the passage of the NGPA that one of the problems contributing to the natural gas shortage on the interstate level was low federal rates. Federal regulation of interstate rates through the Natural Gas Act, 15 U.S.C. § 717, *et seq.*, kept these rates

considerably below the intrastate rates which were not under federal regulation. This caused shortages in the supply of interstate gas in the early 1970's, because gas producers and distributors saved their gas for the more lucrative intrastate market. As the United States Supreme Court noted in *Mid-Louisiana:* "The interstate rates remained substantially below the unregulated prices available for intrastate sales, and the interstate supply remained inadequate." 463 U.S. at 330–331, 103 S.Ct. at 3031, 77 L.Ed.2d at 678. *See also* Breyer and MacAvoy, *The Natural Gas Shortage and the Regulation of Natural Gas Producers*, 86 Harv.L.Rev. 941, 965–79 (1973); Note, *Legislative History of the Natural Gas Policy Act: Title I*, 59 Texas L.Rev. 101, 112 (1980).

■ We conclude from this historical discussion that one of the chief reasons for the adoption of the NGPA was to encourage producers to sell their gas on the interstate market by ensuring that a higher price did not exist in the intrastate market.[1] In order to achieve this result, pricing parity for what the NGPA termed "first sales" was mandated in the interstate and intrastate markets, Sections 104 and 105, 15 U.S.C. §§ 3314, 3315, subject to an important qualification contained in Section 602(a) of the NGPA, 15 U.S.C. § 3432(a): *"Authority to prescribe lower maximum lawful prices.*—Nothing in this chapter shall affect the authority of any State to establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed the applicable maximum lawful price, if any, under subchapter I of this chapter."

This language clearly allows states to set a *lower* price for intrastate sales than that mandated under the NGPA. Obviously, a lower intrastate price is consistent with one of the aims of the NGPA, preventing the intrastate price from going above the interstate price. *Mid-Louisiana* recognized the effect of Section 602(a) in note 20:

"As we recently noted in *Exxon Corp. v. Eagerton*, 462 U.S. 176, 185, 76 L.Ed.2d 497, [507,] 103 S.Ct. [2296, 2303] (1983), § 105(a) of the NGPA extends federal authority to control producer prices to the intrastate market, but at the same time § 602(a) allows the States to establish the price ceilings for that market that are lower than the federal ceiling." 463 U.S. at 339, 103 S.Ct. at 3036, 77 L.Ed.2d at 685.

This point was forcefully made in *Exxon Corp. v. Eagerton*, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983), where Alabama had enacted a severance tax on oil and gas. By statute, it prohibited oil and gas producers from passing on the severance tax to purchasers through their prices. The United States Supreme Court held that the pass-through prohibition on sales of gas in interstate commerce was preempted under the NGPA and, therefore, invalid. However, the Supreme Court refused to invalidate the statute as to intrastate sales, stating:

"We reach a different conclusion with respect to the application of the pass-through prohibition to sales of gas in intrastate commerce. Although § 105(a) of the NGPA extended federal authority to control prices to the intrastate market, 15 USC § 3315(a) [15 USCS § 3315(a) ], *Congress also provided that this extension of federal authority did not deprive the States of the power to establish a price ceiling for intrastate producer sales of gas at a level lower than the federal ceiling. Section 602(a) of the NGPA*, 15 USC § 3432(a) (Supp IV) [15 USCS § 3432(a) ], states that

'[n]othing in this chapter shall affect the authority of any State to establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed the applicable maximum lawful price, if any, under subchapter I of this chapter.' "

---

1. The United States Supreme Court in *Mid-Louisiana* noted that another policy behind the NGPA was "the establishment of a statutory incentive price structure that would simulta- neously promote production and reduce the regulatory burden." 463 U.S. at 331, 103 S.Ct. at 3031, 77 L.Ed.2d at 679.

462 U.S. at 186, 103 S.Ct. at 2303, 76 L.Ed.2d at 507–08. (Emphasis added; footnote omitted).

If *Exxon* is not sufficiently clear, further support for our reading of Section 602(a) is found in *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). There, Kansas had enacted a statute regulating the price of intrastate natural gas. One of the effects of the statute was to establish a price that was lower than the NGPA price. The utility argued in part that the state could not set a lower price than the NGPA, but the United States Supreme Court held that it could, finding this explicit language in the Conference Report on the NGPA:

" 'The conference agreement provides that nothing in this Act shall affect the authority of any State to establish or enforce any maximum lawful price for sales of gas in intrastate commerce which does not exceed the applicable maximum lawful price, if any, under Title I of this Act. This authority extends to the operation of any indefinite price escalator clause.' S.Conf.Rep. No. 95–1126, pp 124–125 (1978); HR Rep No. 95–1752, pp 124–125 (1978)." 459 U.S. at 417, 103 S.Ct. at 708, 74 L.Ed.2d at 584–85.

Additionally, the Supreme Court stated in note 17: "The instant case does not raise a Commerce Clause issue because the parties agree that the gas is not in interstate commerce and because Congress, by § 602, authorized the State to regulate its price." 459 U.S. at 414, 103 S.Ct. at 706, 74 L.Ed.2d at 582. We, therefore, conclude that under Section 602(a) of the NGPA, a state may establish a price for an intrastate producer's sale of gas in intrastate commerce at a level lower than the federal ceiling set by the NGPA.

Pennzoil argues that FERC's Order No. 391 issued on August 22, 1984, forecloses any further assertion of jurisdiction by the PSC over pricing, but we again disagree.

Clearly, FERC's order was issued in response to the Supreme Court's direction in *Mid-Louisiana* to establish whether the NGPA price should be applied "at the intracorporate transfer or the downstream transfer." 463 U.S. at 343, 103 S.Ct. at 3037, 77 L.Ed.2d at 686.[2] In its order, FERC chose the intracompany transfer point, defining it as the wellhead for purposes of applying the NGPA price. Its order had nothing to do with Section 602(a) of the NGPA.

Consequently, the FERC order does not answer the critical question in this case, which is whether Section 602(a) allows the PSC to set a lower price. We believe that both the language of Section 602(a) and the Supreme Court's treatment of this section in *Mid-Louisiana, Exxon* and *Energy Reserves* indicates that the PSC may do so for wholly intrastate sales of gas.

Moreover, *Exxon* appears to refute Pennzoil's argument that commingling of interstate and intrastate gas at the wellhead, the first point of sale for NGPA purposes, prevents separate pricing on the intrastate level, so that the NGPA price applies to all gas. The parties in *Exxon* stipulated "that a substantial portion of the gas extracted ... was sold in interstate commerce." 462 U.S. at 186 n. 6, 103 S.Ct. at 2303 n. 6, 76 L.Ed.2d at 507 n. 6, yet, the Supreme Court had no difficulty in holding that the Alabama severance tax provision was valid as to the intrastate portion of production.

We do not believe that *California v. Lo-Vaca Gathering Co.*, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965), and *Federal Power Comm'n v. Amerada Petroleum Corp.*, 379 U.S. 687, 85 S.Ct. 632, 13 L.Ed.2d 605 (1965), compel an opposite result. Both of these cases involved the jurisdiction of the Federal Power Commission over sales of natural gas in which gas sold in intrastate commerce was commingled with interstate gas. The Supreme Court, relying on prior precedent interpreting the provisions of the Natural Gas Act, 15 U.S.C. § 717, *et seq.*, held that: "The result

---

**2.** FERC acknowledged this on the first page of its Order No. 391 by stating: "This final rule implements the Supreme Court's decision in *Public Service Comm'n of New York v. Mid-Louisiana Gas Co.* [463 U.S. 319], 103 S.Ct. 3024 [77 L.Ed.2d 668] (1983)."

of our decisions is to make the sale of gas which crosses a state line at any stage of its movement from wellhead to ultimate consumption 'in interstate commerce' within the meaning of the Act." *Lo-Vaca,* 379 U.S. at 369, 85 S.Ct. at 488, 13 L.Ed.2d at 360. We do not believe that this interpretation of the Natural Gas Act controls in the present case in view of Section 602(a) of the NGPA and the fact that the gas sought to be regulated in this case is wholly intrastate.

Pennzoil argues as a fall-back position that if Section 602(a) gives the State jurisdiction to set prices, this is a right given to the legislature and not to the PSC. This argument relies on the fact that Section 602(a) utilizes the term "States" which is defined in the NGPA as "each of the several States and the District of Columbia." Section 2(34); 15 U.S.C. § 3301(34). Pennzoil maintains that, as a consequence, only the legislature can act to establish prices, and asserts that our legislature has failed to do so since the enactment of the NGPA. Pennzoil also contends that such an intrastate pricing policy should be implemented by uniform rule rather than by case-by-case determination.

■ With regard to this argument, we believe that Section 602(a) embodied a congressional scheme under which the NGPA would set pricing for intrastate gas, without foreclosing the states from setting a lower price through their own regulatory agencies. Pennzoil does not cite any authority or point to anything in the legislative history of the NGPA suggesting that Congress intended by using the word "States" in Section 602(a) of the NGPA to change the historic method that state legislatures have handled the intrastate regula-

tion of public utilities, which is by legislatively created utility commissions.[3]

■ Furthermore, Pennzoil's argument that any price setting must be done by uniform rule rather than on a case-by-case basis was rejected on the federal level in *Lo-Vaca.* There the Supreme Court disposed of a similar argument with regard to the Federal Power Commission by stating that "we cannot say that the adjudicatory process is not an appropriate method for drawing the line case-by-case (*United States v. Public Utilities Comm'n,* 345 U.S. 295 [97 L.Ed. 1020, 73 S.Ct. 706 (1953)] as in a host of other administrative deliberations." 379 U.S. at 371, 85 S.Ct. at 489, 13 L.Ed.2d at 361. We hereby reject this argument at the state level, if we have not already done so in Syllabus Point 6 of *Chesapeake and Potomac Tel. Co. of West Virginia v. Public Serv. Comm'n,* W.Va., 300 S.E.2d 607 (1982), where we said:

> "Where an agency has been granted broad regulatory authority, it is not obligated to employ any single formula or combination of formulas to determine what in each case are just and reasonable rates."

■ The final argument posed by Pennzoil is that the PSC has no power to regulate wellhead prices under W.Va.Code, 24–2–1. In support of this position, Pennzoil cites *Eureka Pipe Line Co. v. Public Serv. Comm'n,* 148 W.Va. 674, 684, 137 S.E.2d 200, 206 (1964), a case which involved a question of the PSC's jurisdiction to regulate the marketing or production of oil. This Court found that the pipeline company was not serving members of the public and, therefore, was not a public utility. Here, there is no question that part of Pennzoil's gas is sold to members of the public; this is what brings it within the jurisdiction of

---

**3.** There can be no question that the United States Supreme Court is well aware of state regulatory programs, as indicated by these remarks from notes 15 and 16 of *Energy Reserves,* 459 U.S. at 413, 103 S.Ct. at 706, 74 L.Ed.2d at 582:

> "[15] In addition to the Kansas and federal regulations, 38 States regulate various aspects of gas production and sale. See Interstate Oil Compact Commission, Summary of State Stat-

utes and Regulations for Oil and Gas Production (1979).

> "[16] For some time, the Court has recognized the validity of state regulation of the production and sale of natural gas in furtherance of conservation goals.... On several occasions, the Court has approved state price regulation of natural gas that did not interfere with interstate commerce." (Citations omitted).

the PSC. W.Va.Code, 24–2–1 and –3.[4]

It should be noted that this case is styled as a consolidated action. For the reasons stated in this opinion, we affirm the order of the PSC in Case No. 16513.

Case No. 16572 is an original writ of prohibition in which we issued both a rule to show cause against the PSC and a stay of further proceedings. This was done at the request of Pennzoil because it claimed that the PSC was proceeding in the underlying rate case to implement its gas pricing order. This order is the subject of the appeal in Case No. 16513. In view of the fact that we have determined that the PSC has jurisdiction to set pricing of gas produced and sold to retail customers in this State, so long as it does not exceed the NGPA price, we dismiss the rule to show cause in Case No. 16572.

No. 16513—Affirmed.

No. 16572—Writ denied.

---

4. After this appeal was granted, we authorized a petition to intervene on behalf of the consumer advocate division of the PSC. In its brief, a cross-assignment of error is made which in effect challenges the PSC's methodology for setting Pennzoil's price below the NGPA price. The consumer advocate division agrees with the PSC that it has the jurisdiction to set a lower price, but believes the price should be lower than that set by the PSC. We decline to address this issue as it was not presented in the PSC hearing below. Furthermore, while intervention is permitted, under Rule 10(f) of our Rules of Appellate Procedure, cross-assignments of error are ordinarily limited to appellees.