CITIES SERVICE GAS PRODUCING COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

No. 5224.

United States Court of Appeals Tenth Circuit.

May 4, 1956.

Rehearing Denied June 18, 1956.

Robert R. McCracken, Oklahoma City, Okl. (Conrad C. Mount and O. R. Stites, Oklahoma City, Okl., on the brief), for petitioner.

W. Russell Gorman, Washington, D. C. (Willard W. Gatchell, Washington, D. C., and Leo E. Forquer, Bethesda, Md., on the brief), for respondent.

Before HUXMAN and PICKETT, Circuit Judges, and HILL, District Judge.

HUXMAN, Circuit Judge.

This is a petition by the Cities Service Gas Producing Company under Section 19(b) of the Natural Gas Act, as amended, 15 U.S.C.A. § 717r(b), to review and set aside an order of the Federal Power Commission issued July 15, 1955, affirming the decision of the trial examiner issued April 22, 1955, and order denying a rehearing issued August 18, 1955.

The proceeding was initiated and begun under the order of the Commission No. 174–A, requiring all natural gas companies coming under the Act by virtue of the recent decision of the Supreme Court of the United States in Phillips

Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, to take certain steps, among which was a filing of their rate schedules in effect on June 7, 1954, which by the order were determined as the initial and beginning rates. Petitioner filed schedules of rates it was charging its parent, Cities Service Gas Company, for gas produced in the West Panhandle Gas Field at Pampa, Texas, and in the Oklahoma-Hugoton Gas Field in Texas County, Oklahoma. The rates filed and claimed to be applicable were set out in letters of June 14, 1954, and August 24, 1954, from Cities Service Gas Producing Company to the Cities Service Gas Company. These rates were higher than any which had actually been billed between the companies prior to June 7, 1954. The Commission found that the letter agreements effected a change in rates subsequent to June 7; it rejected the higher rates for failure to comply with the filing requirements for changes in rates and adjudged that the effective rates were those charged in billing prior to June 7. This appeal challenges the correctness of the Commission action.

The essential basic facts about which there is no dispute need not be set out at great length. It is sufficient to say that petitioner, Cities Service Gas Producing Company,[1] the producing company, is an affiliate of Cities Service Gas Company.[2] On April 30, 1953, these two entered into a contract by which the Producing Company agreed to sell the parent Gas Company gas from these two fields. The price to be paid for this gas is set out in paragraph 2 of the contract, which is the only provision that needs to be noted. Paragraph 2 provides that the "price to be paid for gas purchased and sold hereunder (which may be subject to change from time to time during the life of the contract) shall be not more than the prevailing field price paid for gas at the wellhead" in the two fields plus reasonable gathering charges; that the "initial price shall be 6.7961 cents per Mcf

for gas produced and delivered from lands in the Pampa, Texas Field and 9.-8262 cents per Mcf for gas produced and delivered from lands in Texas County, Oklahoma Field;" and that "It is intended that the price for gas purchased hereunder shall be the prevailing field price for gas at the wellhead in the respective fields above mentioned and that such price shall be adjusted from time to time to reflect such prevailing field price." On December 23, 1953, the Pampa, Texas field price was changed from 6.7961 cents per Mcf to 7.1863 cents for all gas delivered after that date. No other adjustment in the rates for gas produced and delivered under the contract from either field was made on or before June 7, 1954, the date when the Supreme Court handed down its decision in the Phillips case.

On June 14, 1954, the Producing Company wrote the parent Gas Company a letter. The letter referred to the contract, calling attention to the initial price of 6.7961 cents per Mcf fixed in the contract for the Pampa, Texas field, which was changed to 7.1863 cents as of December 23, 1953. It recited that a study of the prevailing field prices revealed that the contract price being paid and accounted for did not since July 1, 1953, properly reflect the prevailing field price, which in the Pampa field was not less than 7.-7478 cents per Mcf during the six months period from July 1, 1953, to December 31, 1953, and not less than 8.2352 cents per Mcf for the period from January 1, 1954, to June 30, 1954. It was estimated that from and after July 1, 1954, the prevailing field price would be not less than 8.7226 cents. The letter then stated that it was necessary to increase the prices for these respective periods to the prices set out so as to bring them in line with the prevailing field prices. It was proposed that there be an adjustment and payment for the difference between the prices charged and those set out as prevailing field prices for the periods July 1, 1953, to December 31, 1953, and

---

1. Herein called the Producing Company.

2. Herein called the Gas Company.

January 1, 1954, to June 30, 1954, and that after July 1, 1954, and until further notice a price of 8.7226 cents per Mcf be paid. The concluding sentence recited that "If this adjustment of prices meets with your approval, kindly so indicate on the space hereinbelow provided." The Gas Company signed and approved the contemplated procedure on the same day. The Pampa, Texas field price for the first six months of 1954 was subsequently adjusted downward to 8.2071 cents per Mcf by letter agreement of August 24, 1954, to comply with the figures found by the Texas Railroad Commission in its semi-annual report.

No adjustment was made as to purchases from the Texas County, Oklahoma field although the June 14, 1954 letter stated that adjustments may be necessary and suggested holding them in abeyance pending a completion of a study by Producing Company of the prevailing field prices in that field. The rates filed by Producing Company with the Commission, nevertheless, contained an adjustment to 10.1829 cents per Mcf, corresponding to the prices shown in a chart it prepared for another proceeding covering weighted average cost at the wellhead during the first three months of 1954.

The Commission found that the adjusted price of 7.1863 as of December 23, 1953 for the Pampa, Texas field and the original contract price of 9.8262 for the Oklahoma field were the true rates as of June 7, 1954.

Petitioner contends that the initial prices set out in the contract were only tentative prices and that it was intended that the actual price for gas delivered during the months of the accounting periods should be the average wellhead price for gas in the field when ascertained, and that when so ascertained, subsequent to the expiration of the period, an adjustment should be made. To illustrate, if the average wellhead price at the end of a period was determined to be higher than the price named in the contract the Gas Company would be billed for an additional amount, and if it was lower a refund would be due. Petitioner's position is that this subsequently determined price for the period in which June 7, 1954 was included was the real price in effect on that date rather than the lower contract price actually being charged and collected at the time. That theory was rejected by the Commission. It found and held that the prices which were charged and billed for during the months immediately preceding June 1954 were the effective rates which should be filed.

The Commission advances two contentions in opposition to petitioner's position. They are (1) There is no ambiguity in paragraph 2 of the contract, its clear meaning is that the prices stated therein are the actual prices for gas sold until a different price is established by the ascertained wellhead prices in the two fields, and any changes in the price structure required by changing wellhead prices would be applied only prospectively; and (2) in any event the escalator provision of the contract is void because no definite yardstick for establishing such a price is laid down in the contract.

The Producing Company contends that our recent decision in Phillips Petroleum Company v. Federal Power Commission, 10 Cir., 227 F.2d 470, requires an overturning of the determination by the Commission. With that contention we cannot agree. The only similarity between the two cases is that in each is involved a contract containing an escalator clause, but there the similarity ends. In the Phillips case the yardstick for determining the new prices was definite and certain. The exact mathematical formula for computing such new price was set out. The exact date when new prices should go into effect was likewise set out. No question of the retroactive application of such new price was involved. In the Phillips case, the price which was filed with the Commission as the price in effect on June 7, 1954 had been in effect since January, 1953 and had been collected since that date. All we held was that this price was put into

effect when the parties were free to contract; that it was in effect when the Commission issued its regulation; and that therefore the Commission was powerless to set it aside other than after a regular hearing under its general rate supervisory powers. We were careful to point out that "it is one thing to treat an escalated rate effective after June 7, 1954 as a change in rate or new schedule. It is quite another to treat a rate already in force on June 7, 1954 by virtue of the automatic provisions of an escalator clause in a contract as a new schedule or change in rates." We stated that the contract and the letters announcing the new prices "were entered into at a time when the parties were free to contract with respect to the sale of gas."

 The conclusion is inescapable that the meaning of paragraph 2 is that the prices for the gas were the prices set out in the contract, that such prices would remain until new prices were established in accordance with the formula set out in the contract, and that such new prices applied only prospectively. Had the parties intended that the prices stated in the contract were only tentative subject to later retroactive adjustment, it would have been easy so to state. Nowhere in the contract does the phrase "tentative prices" appear. We are asked to read that into the contract. Significant also is the fact that the contract contains no reference to any agreement to pay retroactively additional sums for past periods when higher prices are established, or to make refunds for preceding months where lower wellhead prices are established.

We think this construction finds support in the administrative interpretation which the parties placed upon the contract. It is to be noted that with respect to the Pampa, Texas field one change in price was made prior to the letter agreement of June 14, 1954. The price for gas in that field was increased from 6.7961 cents per Mcf to 7.1863 cents, effective December 23, 1953. According to the evidence in the record, that increase was based upon the semi-annual report of the Texas Railroad Commission of the average weighted wellhead prices paid during the first six months of 1953. Under Producing Company's theory, there would have been a retroactive settlement due for the difference in prices for the months of April, May and June, 1953, the initial months covered by the contract. But the record is without dispute that this new price was applied only prospectively and that the parent company was not billed for the difference in prices. The only explanation offered for the failure to adjust was that the amount involved was very small. While no exact amounts are given, approximate calculations can be made. The basic contract provided for the taking of not less than 80,754,788 Mcf of gas annually. Assuming that about one-half of this annual quantity was taken from the Pampa, Texas field (the bill submitted to the Commission for May 23 to June 22, 1954, showed almost twice as much taken from the Texas field as from the Oklahoma field), the required adjustment for these three months would be approximately $40,000. That is not an insignificant or infinitesimal sum, and there can be no presumption that the seller did not intend to collect the full amount due it from the purchaser merely because the parties were parent and child.

Significant also is the fact that when the parties in June, 1954 agreed to adjust prices they found it necessary to hold top level conferences with respect to such adjustments. A number of such conferences were held and apparently only then was the letter of June 14, 1954 prepared. If the original contract provided for automatic adjustments and laid down the yardstick therefor, no such conferences were necessary. All that would have been required would have been a letter simply stating that the new prices were in effect as of a designated date. Neither would it have been necessary to state in the letter that "If this adjustment of prices meets with your approval, kindly so indicate on the space hereinbelow provided." The purchasers would have had no option in the matter.

We have here no arm's length dealing. It is significant that the letter proposing the changes in price was accepted on the same day it was written. It is our view that the prices being charged on June 7, 1954 were as found by the Commission to be the actual prices as of that date, and that the petitioner's contention as to the retroactive effect of the adjusted rate must be rejected. This does not, however, dispose of the controversy.

The contract clearly contemplates prospective adjustment of prices. While it is not free from doubt, we are inclined to agree with petitioner's contention that the yardstick for the determination of such prices is sufficiently definite. "Prevailing field price" has a definite and well understood meaning in the oil and gas industry. What is the prevailing field price is a question of fact which can be readily ascertained, and any method which would fairly reflect such price would be a proper yardstick under the contract. It would have been more satisfactory, especially in dealings between affiliates, if the contract had provided methods of calculating field prices more explicit and definite and had also set out dates when such prices were to go into effect. However, there are a great many contracts in oil and gas and other areas of the law in which a price to be paid is designated as dependent upon "market price" or a like term of no more certainty than in this contract; notable among these are royalty interests under oil and gas leases. Yet these contracts are held to provide a calculable figure sufficiently definite for enforcement.[3] We think a normal reading of the contract is that whenever either party believes the price being paid no longer reflects the prevailing field price that party may require an examination of the field prices, and if its beliefs are substantiated may require a change upward or downward as warranted by a result of the examination.

The contract clearly contemplates prospective adjustments of rates from time to time. The letter of June 14, 1954 constituted such an adjustment. At the time this adjustment was made, Regulation 174–A had not been issued and, of course, could not constitute a bar to such adjustment. Neither could it have the effect of rolling back the price to that of June 7, 1954. Aside from constitutional inhibitions, Section 5(a) of the Act, 15 U.S.C.A. § 717d(a), prevents such action. It provides that the findings of the Commission only determine the rate to be thereafter observed and enforced.[4]

But aside from Regulation 174–A, the increase in rate provided for in the letter agreement of June 14, 1954 was in our opinion ineffective. Prior to the decision in Phillips Petroleum Company v. Wisconsin, supra, the Commission had failed to recognize and exercise its jurisdiction over activities such as those of petitioner. Such activities were from their inception covered by the Natural Gas Act, and certainly from June 7, 1954, the date of the Phillips decision, petitioner knew that its activities were subject to the provisions of the Act. Section 4(d) of the Act, 15 U.S.C.A. § 717c(d), provides that "Unless the Commission otherwise orders, *no change shall be made* by any natural-gas company *in any such rate, charge,* classification, or service, or in any rule, regulation, or *contract relating thereto, except after thirty days' notice to the Commission and to the public.*" This section was in force and effect on June 14, 1954 when the Producing Company and the Gas Company intended to effect an increase in prices. They could not validly effect such a change in rates without complying with the requirements of Section 4(d). They gave no notice of any kind, let

---

3. See Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561; Shamrock Oil & Gas Corp. v. Coffee, 5 Cir., 140 F. 2d 409; Words & Phrases, "Prevailing price," "Market price," "Current market price"

4. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S. Ct. 281, 88 L.Ed. 333.

alone the notice required by Section 4(d). Their failure to do so made invalid and ineffective their attempt to change their rates. It follows that the rate they were charging on June 7, 1954 was the rate they were required to file with the Commission.

Affirmed.