**PLAQUEMINES OIL AND GAS COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION,**
**Respondent.**

**No. 24550.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 14, 1971.

Decided Sept. 28, 1971.

Mr. Edward L. Merrigan, Washington, D. C., for petitioner.

Mr. Charles K. Barrow, Atty., Federal Power Commission with whom Messrs. Gordon Gooch, General Counsel, George P. Lewnes, Asst. General Counsel, Federal Power Commission, and Peter H. Schiff, Solicitor, Federal Power Commission at the time the brief was filed, were on the brief, for respondent. Mr. Joseph Richard Tiano, Asst. Solicitor, Federal Power Commission, also entered an appearance for respondent.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

The question on this appeal is whether the Federal Power Commission, in retroactively applying the Natural Gas Act to sales of the Plaquemines Oil and Gas Company between 1961 and 1966, the years in which the Commission asserted jurisdiction over such sales and in which Plaquemines filed for certification, was justified in flatly requiring Plaquemines to refund all sums derived from a 1964 rate increase without first determining its validity. The Commission simply ruled that since Plaquemines' sales in 1964 were within the jurisdiction of the Commission and "a rate change pursuant to a contract escalation provision is forbidden in the absence of compliance with the filing provisions of the Act," the 1964 rate increase was without effect and the sums derived therefrom must be refunded. For reasons that follow we reverse and remand to the Commission.

## I. Background of the Controversy

In 1961 the Federal Power Commission ruled in *Lo-Vaca Gathering Company* [1] that regardless of the recitation in a contract for the sale of natural gas, if the gas sold is physically commingled with gas destined for resale in interstate commerce, the sale is within the Commission's jurisdiction. On appeal the Fifth Circuit reversed, but in 1965 the Supreme Court affirmed the Commission's ruling in California v. Lo-Vaca Gathering Company.[2]

Virtually all of the companies involved in the approximately one thousand natural gas sales contracts over which the Commission had asserted jurisdiction in 1961 waited until after the Supreme Court decision in 1965 to apply to the Commission for certification. Plaquemines did not apply for a certificate until 27 June 1966.[3]

---

1. 26 F.P.C. 606 (1961).

2. 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965), reversing Lo-Vaca Gathering Co. v. FPC, 323 F.2d 190 (5th Cir. 1963).

3. In a *Supplemental Memorandum* filed after oral argument, the Commission informed us that "[a]pproximately one thousand certificates have been issued for sales of natural gas which are jurisdictional because the gas is commingled with an interstate gas stream in a pipeline. * * * Of these sales, approximately 36 involved restricted-use contracts. No ap-

The facts relating to Commission jurisdiction over Plaquemines and that company's subsequent difficulties in obtaining certification are these: in 1956 Plaquemines, doing business, exclusively in the Plaquemines Parish of southern Louisiana, contracted with Tennessee Gas Transmission Company to sell natural gas over a period of 20 years. The contract recited that title would pass to Tennessee within the state of Louisiana and contained an escalator clause increasing the price of the gas in the following progression:

From date of initial delivery
to November 1, 1959 . . 17 cents per McF

From November 1, 1959
to November 1, 1964 . . 18 cents per McF

From November 1, 1964
to November 1, 1969 . . 19 cents per McF

From November 1, 1969
to November 1, 1974 . . 20 cents per McF

From November 1, 1974 to date of expiration of this contract . . 21 cents per McF

It is undisputed that Tennessee commingled this gas with other gas in its lines destined for resale in interstate commerce.

On 26 February 1970 the Commission, after hearings and an examiner's decision, issued an opinion finding these sales to "fall squarely within Section 1(b) of the Natural Gas Act, as construed in *Lo-Vaca*," and granted Plaquemines an unconditioned certificate of public convenience and necessity to permit it to continue its operations.[4] On 30 March 1970 the Public Service Commission of the State of New York filed a petition for rehearing alleging *inter alia* that this decision was legally defective because all increases collected by Plaquemines above the initial (1956) 18 cent[5] price were void *ab initio* as not made in conformity with the filing requirement of Section 4(d)[6] of the Natural Gas Act—allegedly an essential prerequisite to the validity of a rate increase.

In an opinion and order denying rehearing[7] the Commission found that until its *Lo-Vaca* decision in 1961 Plaquemines was excused for failing to file for certification, but that in the wake of the position the Commission announced in *Lo-Vaca* the duty to file fell inescapably on Plaquemines. With respect to the period of time extending from 1961 to the day on which Plaquemines filed for certification, 27 June 1966, the Commission therefore retroactively applied the Act. Recognizing the lack in the record of 1961 cost information, the opinion took notice of the "existing in-line price for on-shore independent gas producers in Southern Louisiana [20 cents per McF]" and held that "[w]hile *Plaquemines is a pipeline and not a producer*, we think it reasonable, in light of the then *in-line price* and the *minimal size and impact* of the sale here involved, to conclude that if Plaquemines had in 1961 filed with us [under Section 7[8] of the Act] its then current price of 19.5 cents per McF for sales to Tennessee, we would have found the rate acceptable."[9] The

---

plications for a certificate for the latter type of sale were made prior to 1965, while a small number were made for the former type of sale."

4. Plaquemines Oil and Gas Company, Opinion No. 572 (F.P.C. 26 Feb. 1970).

5. This figure does not square with the rate schedule of the contract, *see* text at 3, *supra*, but was used as the 1956 rate by the Commission and the Public Service Commission of the State of New York. Likewise the 1961 price of 19.5 cents per McF. quoted in Commission Opinion 572-A does not coincide with the

contract rate for that year. These discrepancies are apparently due to a change in price made necessary to comply with the Louisiana severance tax. See *Petitioner's Brief*, at 6n.

6. 15 U.S.C. § 717c (d).

7. Plaquemines Oil and Gas Company, Opinion No. 572-A (F.P.C. 29 April 1970).

8. 15 U.S.C. § 717f.

9. The emphasized phrases acquire considerable significance in light of the Commission's argument later put before us. See *infra*, text accompanying notes 21–24.

opinion continued, "In any event the cost to the Commission and to the parties of attempting to reconstruct, at a new hearing now, what the Commission might have done in 1961, would almost certainly outweigh any benefits to be gained thereby." [10]

But with respect to the rate increase of 1 November 1964, the Commission was not so generous. Citing cases invalidating rate increases of gas companies which were not filed in compliance with Section 4(d) of the Act,[11] the Commission held that "[f]rom that date until the date Plaquemines did seek to file with us, on June 27, 1966, Plaquemines should be required to refund to Tennessee 1 cent per McF for the gas sold to Tennessee." Then, construing Plaquemines' 1966 filing for certification under Section 7 as a Section 4(d) rate-change filing (because the record did contain some cost data for the years 1965–1968), the Commission concluded "that the 20.5 cent price on and after July 29, 1966, is justified, and that refunds on and after that date are not required." This determination left Plaquemines with an obligation to refund to Tennessee $62,000. Plaquemines appealed.

## II.  *Application of Lo-Vaca as of 1961*

■ Question has been raised in this case whether the Commission is correct in applying its ruling in *Lo-Vaca* as of the date of its own decision rather than as of 18 January 1965, the date on which the Supreme Court reversed the Fifth Circuit and affirmed the Commission. We conclude that the Commission is properly enforcing the *Lo-Vaca* ruling.

All affected natural gas companies were on notice as of the date of the 1961 *Lo-Vaca* decision that the Commission was asserting jurisdiction over them.

The adverse Fifth Circuit determination apparently left the Commission undaunted in regard to its jurisdiction. The Commission by appealing to the Supreme Court gave notice to these companies that it was not acquiescing in the jurisdictional interpretation of the Fifth Circuit. The Commission's confidence was well founded; the Supreme Court found the Commission's interpretation of its own jurisdiction to be correct.

Federal agencies such as the Federal Power Commission are national in scope and are not confined to any particular Federal jurisdiction. Their rules are of general application and must apply in the same way to all affected parties. Here the Commission's assertion of jurisdiction over sales of local gas companies, resulting in the commingling of their gas with gas transported in interstate commerce, was initially applied to Lo-Vaca in 1961 and undoubtedly operated with respect to Lo-Vaca as of 1961 upon affirmance by the Supreme Court in 1965. If this ruling is to apply equitably to companies similarly situated to Lo-Vaca, they too must be considered affected as of 1961, and the Commission has so considered them.

## III.  *Equitable Retroactive Application of the Act to Plaquemines*

■■ Likewise, we do not hesitate to apply here the position we took with respect to comparable provisions of the Federal Power Act in Niagara Mohawk Power Corp. v. FPC:[12] that the Commission, in acting upon applications for certification filed some time after Commission jurisdiction was asserted (in this case about five years), has the equitable power "to regard as being done that which should have been done" by recreating the past, insofar as is reasonably possible, to reflect compliance with the Act

---

10. In relation to the applicability of considerations of this type, see n. 13, *infra*.

11. The Commission cited Socony Mobil Oil Co. v. The Brooklyn Union Gas Co., 299 F.2d 692 (5th Cir. 1962), and Shell

Oil Co. v. FPC, 334 F.2d 1002 (3rd Cir. 1964).

12. 126 U.S.App.D.C. 376, 379 F.2d 153 (1967).

and to order refunds to be paid if necessary to achieve that goal.[13]

In this case, however, there appears to have been some confusion on the Commission's part in carrying out its purposes in retroactively applying the Act. Time and again in brief, the Commission reminds us that all it was doing with respect to Plaquemines' jurisdictional sales in the period 1961–1966 was recreating the past to reflect *compliance* with the Act.[14] And indeed, with respect to sales made by Plaquemines in 1961 when Plaquemines should have filed for certification, the Commission did just that: it found that had Plaquemines filed under section 7 in 1961, the rate charged Tennessee would have been in compliance with the Act and hence no compensatory steps were required.

When it came to the 1964 rate increase, however, the Commission seems to have forgotten its original purpose: *reconstructing* Plaquemines' jurisdictional sales between 1961 and 1966 to reflect *compliance* with the Act. Instead Plaquemines was treated like an already certificated company that had *not complied* with section 4(d). Unlike Plaquemines' 1961 rate, the rate increase in 1964 was not measured against any standards to determine whether it would have been in compliance with the Act. It was summarily rejected and all sums attributable thereto were ordered refunded.

■ We think that having started out to reconstruct Plaquemines' sales to reflect compliance with the Act, the Commission was bound to carry that purpose through in regard to all transactions that would have been the subjects of filings had Plaquemines been complying with the Act in the 1961–1966 period.[15] Thus

13. We insert the caveat "insofar as is reasonably possible" because we recognize that instances may arise where attempts by the Commission to determine what it would have done in previous years, had filings been made in compliance with the Act, may be unavailing because of lack of absolutely essential data, or may be so financially burdensome on the Commission (and, hence, the public purse) or the parties as to be prohibitive. In such circumstances, if the Commission does not possess readily available alternative standards against which to assess compliance with the Act during the period of time in which filings should have been made, it is our view that the Commission may reasonably resolve any doubts regarding compliance against the wrongdoer. Such resolution would not, we think, constitute the exaction of a reparation from the wrongdoer for failing to file in a timely manner, see Mesa Petroleum Co. v. FPC (No. 28,229, 5th Cir. 6 April 1971), slip op. at 9, but would merely constitute the unavoidable consequences of its own dereliction, since had certification been timely sought the necessary data would have been available to the Commission. A resoluton of doubt in favor of the wrongdoer could be a detriment to the public, on whose behalf the Commission is bound to act, since the unfiled rates may indeed have been found in excess of acceptable limits under the Act. Likewise, to expend huge amounts of time and money on potentially worthless hearings in attempting to simulate the relative position of the parties years ago would work an injury on the public.

14. At page 5 of its brief the Commission states, "In the Commission's view the refunds are required to recreate a situation reflecting, to the extent possible, compliance with the Natural Gas Act." Similarly, at page 6 of its brief the Commission states, "[T]he Commission's power to recreate the past to reflect compliance with such an Act is at least as great where no attempt at compliance had ever been made. * * *" (Citing our opinion in *Niagara Mohawk, supra.*)

15. We are aware of cases in other Circuits which speak as if there is implied recognition in section 5(a) of the Act (15 U.S.C. § 717d(a)) that the parties to the sale of natural gas in interstate commerce may *initially* establish a rate schedule by mutual agreement but that because of the prohibitory language of section 4(d) no rate *change* may be effective unless filed in accordance with that section's provisions. Shell Oil Co. v. Federal Power Commission, 334 F.2d 1002, 1008 (3rd Cir. 1964); Socony Mobil Oil Co. v. The Brooklyn Union Gas Co., 299 F.2d 692, 694 (5th Cir. 1962); Natural Gas Pipeline Co. of America v. Harrington, 246 F.2d 915, 918–919 (5th Cir. 1957). We think such reasoning has little applicability when the Commission is attempting in as fair and as practical a manner as possible retroactively to ap-

it was error to reject the 1964 rate increase without first attempting to determine whether the rate rise would have been accepted by the Commission had it been the subject of a post-adjustment filing in 1964.

We are at a loss to understand why this approach was eschewed in this case, particularly in view of evidence in the Commission's Supplemental Memorandum, filed after oral argument, showing that this course *was* followed in retroactively applying the Act to all 36 other restricted-use contracts over which jurisdiction of the Commission was extended in *Lo-Vaca*.[16] No gas company involved in such contracts filed for certification until after the Supreme Court decision in 1965, and each restricted-use contract contained escalation clauses providing for rate increases between 1961 and 1965. Yet not one other gas company, though identically situated to Plaquemines, was required to refund sums resulting from such rate increases on the mere ground that they were not filed in accordance with section 4(d) of the Act.

In a reply to Plaquemines' *Response to the Commission's Supplemental Memorandum*, the Commission seeks to avoid the implications of the facts revealed in its *Supplemental Memorandum* by pointing out that Plaquemines is a *pipeline* while "all but one of the companies which received a certificate without a refund obligation were *producers*."[17] According to the Commission, this distinction is critical because pipelines, assertedly unlike producers, must in certificate applications under section 7 and rate increase filings under section 4(d) provide cost-of-service data to justify their prices as just and reasonable. Since Plaquemines had not fulfilled its obligation to insert cost data in the record justifying under section 4(d) the rate increase in 1964, so the argument goes, the Commission was unable to determine reasonableness as of that year; hence, the necessity of a refund.

Whatever validity the argument may have in other contexts [18] it has no valid-

---

ply the Act to a company that has never been certificated under section 7.

In terms equally as prohibitory as those of section 4(d), section 7 provides:

> (c) *No* natural-gas company * * * *shall* engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, * * * *unless* there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations; * * *

We would suppose, therefore, that under the rationale of the above cases the Commission might have the authority to order a company like Plaquemines to make refunds dating from 1961 in order to reflect the position it would have been in had it never become involved in jurisdictional sales of natural gas until 1966, when it did apply. Of course, the effects of such a ruling would be ruinous to Plaquemines' services—a wholly unreasonable and unpalatable result.

This approach smacks of the vindication of statutory duties rather than the reasoned retroactive application of a statute such as we approved in *Niagara Mohawk*. We have not heard the Commission to argue that its purpose was the former instead of the latter. Indeed, *see* n. 13,

*supra*, we have been assured by the Commission that it merely seeks the latter. This being so, we think the Commission should, consistent with its purpose, have considered Plaquemines' 1964 rate rise to see if the Commission would have approved its 1964 certificate application seeking approval of the price as in line with prices then prevailing.

16. *Supplemental Memorandum*, at 2–4.

17. *Commission Reply to Plaquemines' Response to Supplemental Memorandum*, at 3 (emphasis supplied). According to this Commission memorandum the other pipeline company was Lumar Gas Corporation. Its rate increased in the 1961–1965 period from 14.6 to 15.6 cents per McF. No section 4(d) filing was made, yet the Commission required no refund. The Commission blandly explains, "Neither Commission order discussed refunds, and none were required of Lumar." *Supplemental Memorandum*, at 3.

18. See text at 4–5, *supra*. The Commission opinion requiring that the amount derived from the rate increase be refunded is devoid of any similar reference to the lack of cost data for the year 1964. (See Plaquemines Oil and Gas Company, Opinion No. 572-A (F.P.C. 29 April 1970).)

**1340**

ity here.[19] No cost-of-service data were provided in the record for the year 1961. Yet the Commission did not seem overly troubled by this omission; it found what must have been an acceptable alternative standard against which to measure for section 7 purposes Plaquemines' 1961 rate—the existing in-line prices for on-shore gas producers in Southern Louisiana. From the Commission's Supplemental Memorandum we draw the conclusion that the Commission repeatedly has determined the validity of past prices by comparison with its data on in-line area prices current at the relevant date. This is precisely what the Commission determined in regard to Plaquemines for 1961—but not 1964. The refund order for the period 1 November 1964 to 29 July 1966 appears to put Plaquemines in a class by itself, and on a unique rationale. There appears to be no other pipeline or producer which has been forced to make any refund for the period subsequent to the original 1961 *Lo-Vaca* decision without the Commission making a clear finding or the company making a concession of a price out of line.[20]

In its reply to Plaquemines' Response to its Supplemental Memorandum, the last of its three briefs filed, the Commission, as noted above, attempts to draw

a distinction between standards applicable to a gas producer and a gas pipeline, asserting that on a producer's certificate application the standard is whether the price is "in-line," while "[t]he standard applied to a pipeline's price in a certificate application and in a rate-increase filing is whether cost-of-service data justify the price as just and reasonable."[21] Whether this is a valid and relevant distinction in other cases is immaterial here. The essential here is that in its proceedings before this appeal the Commission did not act on this distinction in its treatment of Plaquemines and others similarly situated.[22] When it looked at Plaquemines' 1961 rates, it found them reasonable by comparison with other area rates, not in relation to costs, for it had no cost data. Nor does it help the Commission now to assert that the fact that Plaquemines' "rate in 1961 was less than the in-line price * * * was only one of several reasons" for not requiring cost data,[23] because the other reasons, *i. e.*, "minimal size and impact" and "probability that the benefits of reconstructing the situation would have been outweighed by the cost"[24] may be equally applicable to 1964 as 1961.

Thus, because the sale to Tennessee was "minimal" in size and impact, the

---

19. See n. 13, *supra.*

20. We are cited to three cases in which refunds were required: George Despot, 38 F.P.C. 1041 (1967), 39 F.P.C. 232 (1968), in which the companies agreed to refund the excess of the contract price over the in-line price; Pan American Petroleum Corp., 42 F.P.C. 586 (1969), same result; and Mesa Petroleum Co. v. FPC, (5th Cir. 6 Apr. 1971), 441 F.2d 182, in which the examiner and the Commission found sales at a price in excess of "the reasonable in-line price" and ordered a refund.
   The FPC did not make any finding or analysis that there were a number of persons in petitioner's position who did file promptly after the FPC's 1961 decision, and were unable to apply escalator clauses because of inability to meet 4(d) standards. Accordingly, this opinion does not address itself to what might be the result if that had been the situation, or the basis of FPC's order.

21. *Commission Reply to Plaquemines' Response to Supplemental Memorandum*, at 2.

22. The Commission was not then troubled, as it now seems to be, by the fact Plaquemines is a pipeline and not a producer. It stated: "While Plaquemines is a pipeline and not a producer, we think it is reasonable in light of the then in-line price and the minimal size and impact of the sale here involved, to conclude that if Plaquemines had in 1961 filed with us its then current price of 19.5 cents McF. for sales to Tennessee, we would have found the rate acceptable." Plaquemines Oil and Gas Company, Opinion No. 572–A (F.P.C. 29 April 1970).

23. *Commission Reply to Plaquemines' Response to Supplemental Memorandum*, at 3.

24. *Ibid.*

Commission considered that in the absence of the usual cost-of-service data it was "reasonable" to measure the rate charged by Plaquemines against the in-line prices for on-shore gas producers in Southern Louisiana.[25] There has been no showing by the Commission that the sales of Plaquemines to Tennessee in 1964 were so much greater in size or impact than those "minimal" sales in 1961 that it would be *un*reasonable to determine in like manner the acceptability under the FPC's "in line" criteria of the petitioner's price as adjusted in 1964. Because we think the proper focus, developed by the FPC generally in section 7 cases, is whether the price proposed by the applicant for certificate is "in line" with prevailing prices, the parties and the FPC are given a far easier task, generally speaking, than that involved in trying to make a determination at this time, or at the time of the filing of the application, of what would have been considered "reasonable" for purposes of permitting a rate increase under section 4. The determination of in-lineness does not involve the same individual review of costs as is required for approval of an increase under section 4(d).

We therefore remand this case to the Commission for a determination of whether Plaquemines' jurisdictional sales in 1964 were generally of the same limited size and impact as those in 1961 and, if this be found true, for the further determination of whether the 1964 rate as increased would have exceeded the 1964 in-line prices for on-shore gas producers in Southern Louisiana.[26] If the 1964 rate would not have exceeded these in-line prices, we direct that the order requiring any refund of Plaquemines be vacated; and if an excess be found, we direct that in any resulting refund order Plaquemines be required in accordance with the "Mobil formula"[27] to refund only 62.5 percent of the excess over the in-line prices for the interval between

the rate rise (1 November 1964) and the date the Commission has already determined such rates to be valid (29 July 1966).

So ordered.

25.  See note 22, *supra*.

26.  In the event the Commission's data are not sufficient for it thus to proceed,

see note 13, *supra*, it may so state and act accordingly.

27.  *See Supplemental Memorandum*, at 3.