The judgment appealed from will be vacated and the case remanded for a new trial.

**BOROUGH OF ELLWOOD CITY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Pennsylvania Power Company, Intervenor.**

No. 77–1690.

United States Court of Appeals, Third Circuit.

Argued March 27, 1978.

Decided Aug. 8, 1978.

Patrick McEligot, Washington, D. C., Marvin A. Luxenberg, Charles W. Garbett, Ellwood City, Pa., for petitioner Borough of Ellwood City; Rea, Cross & Auchincloss, Washington, D. C., of counsel.

Robert R. Nordhaus, Gen. Counsel, Philip R. Telleen, Joseph G. Stiles, Attys., Washington, D. C., for respondent, Federal Energy Regulatory Commission.

Steven A. Berger, Steven B. Peri, Winthrop, Stimson, Putnam & Roberts, New York City, for intervenor Pa. Power Co.; James R. Edgerly, New Castle, Pa., of counsel.

Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

The Borough of Ellwood City (Ellwood) has petitioned this court, pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), to review an order of the Federal Power Commission[1] denying Ell-

1. Pursuant to the provisions of the Department of Energy Organization Act, Public Law 95–91, 42 U.S.C. § 7101 (August 4, 1977) and Executive Order No. 12009, 42 Fed.Reg. 46267 September 13, 1977, the Federal Power Commission ceased to exist on September 30, 1977. The Federal Energy Regulatory Commission, to which most of the FPC's powers have been

wood refunds from the Pennsylvania Power Company (Penn Power) for the period 1939 to 1964. Ellwood claims that it is entitled to those refunds because it made payments to Penn Power for electrical energy in excess of the rates filed with the Commission governing such sales. We will affirm the order of the Commission.

## I. THE HISTORY OF THE PROCEEDINGS

This case is vivid illustration of Mr. Justice Holmes' maxim, "[A] page of history is worth a volume of logic." [2] Only after one understands the history of the relationship between Penn Power, Ellwood, the Federal Power Commission and the Pennsylvania Public Utilities Commission does one recognize that the surface logic of Ellwood's contention leads to a conclusion inconsistent with the relevant statutes and the principle of consumer protection those statutes embody. The complexity of this case has been accentuated by Penn Power's having been lulled for over 25 years into believing that the Commission had no jurisdiction over the sales in question. Penn Power is not to be faulted for this belief, since the Commission itself assumed it was without jurisdiction over these transactions. During the period in which Penn Power did not file with the Commission, it did not operate without regulation. Its rates were reviewed by the Pennsylvania Public Utilities Commission which considered itself to have jurisdiction over these sales. Thus Ellwood is now demanding that the Commission order refunds on the basis of sales that the Commission had initially considered beyond its jurisdiction and which the Pennsylvania Public Utilities Commission had considered within its scope of authority.

With the preceding as introduction, we will now detail the history that has so far only been alluded to. That history begins on November 8, 1934, when Ellwood and

Penn Power entered into a five-year contract for the sale of electricity to begin on December 1, 1935.

In October 1938, the Commission directed Penn Power to file the above agreement. Later that month, Penn Power sent to the Commission a rate schedule covering the sales to Ellwood. In November 1938, the Commission replied that the filing of this rate schedule did not comply with the Commission's request and directed Penn Power to file the agreement itself. In December 1938, Penn Power complied with this request. The Commission informed Penn Power, in October 1939, that the 1935 agreement with Ellwood was numbered Pennsylvania Power Company Rate Schedule FPC No. 6 and was given an effective date of December 1, 1935. Later that month Penn Power acknowledged receipt of this information.

Prior to 1939, Penn Power purchased all of its energy from an out-of-state affiliate. In 1939, it began generating power in Pennsylvania although it also continued to buy power from its out-of-state affiliate. Because Penn Power's within-state generating capacity was sufficient to meet the demands of Ellwood and its other Pennsylvania wholesale customers, it considered itself subject to regulation by the Pennsylvania Public Utilities Commission (PUC) rather than the FPC. Rate changes were therefore filed with the PUC. Ellwood participated in some of these PUC proceedings.

In 1964, the Supreme Court decided the *Colton* case, *FPC v. Southern California Edison Co.*, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964). In that case, the Court held that sales of power by a California utility to the City of Colton were subject to Commission jurisdiction because some of the power came from out of state. The utility there, like Penn Power, also generated power within the state. The Court's

transferred, has been substituted as a party to this case pursuant to Section 705(e) of the Organization Act, 42 U.S.C. § 7295(e). Reference to the Commission, in the context of actions before October 1, 1977, is to the FPC. Reference to the Commission in the context of

actions thereafter is to the Federal Energy Regulatory Commission.

2. *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921).

holding reversed the Ninth Circuit decision that the Commission did not have jurisdiction because the state regulated the sales and such state regulation was permissible under the Commerce Clause.

The Commission then issued Order No. 282, 31 FPC 972 (1964), which provides in part:

The Commission has received a number of inquiries from public utilities who are presently engaged in reviewing the status of their wholesale power sales, in the light of the recent Supreme Court decision in the *Colton* case, *Federal Power Commission v. Southern California Edison Company*, 376 U.S. 205 [84 S.Ct. 644] 11 L.Ed.2d 638, decided March 2, 1964, as to the manner in which the Commission would expect to treat filings made with it of existing wholesale sales which had not previously been filed with this Commission. In response to such inquiries the Commission believes it appropriate to advise all public utilities that, while it of course cannot prejudice the possible rights of interested third parties, its primary objective is in insuring that the rate schedules for all jurisdictional sales are promptly filed with this agency, as required by law, and that where such rate schedules are filed with this agency by August 1, 1964, it does not intend on its own motion to initiate any inquiry into past failures to file such schedules.

In accordance with this policy the Commission, in the absence of valid objection by any interested party, will permit all existing rate schedules to be filed as initial rate schedules pursuant to the provisions of Section 35.1(b) of its Regulations under the Federal Power Act and will give favorable consideration to requests pursuant to the provisions of Section 35.-11 of these Regulations to make such schedules effective as of the date of filing or such earlier date as the public utility may show is consistent with the public interest, if such filings are made on or before August 1, 1964.

In June, 1964, Penn Power was told that, in the opinion of the Commission's staff, it did not have to refile the initial rate filings including Rate Schedule No. 6 that covered sales to Ellwood. Penn Power did file the past unfiled wholesale rate schedules and the Municipal Resale Service rate schedule which governed sales to Ellwood since March 1960. In September 1964, the Commission notified Penn Power that these schedules were accepted for filing as of August 3, 1964 and that the Municipal Resale Service rate schedule was designated Supplement No. 4 to Rate Schedule No. 6 and given an effective date of September 3, 1964.

In August 1966, Penn Power and Ellwood entered into a new contract, effective June 1966, which resulted in a rate reduction to Ellwood. This contract was filed with the Commission.

On October 21, 1966, Ellwood filed a complaint against Penn Power under Section 306 of the Federal Power Act, 16 U.S.C. § 825e, seeking the refund of charges collected between December 16, 1939 and September 3, 1964 in excess of the rates set forth in Rate Schedule No. 6. Although the parties had filed a number of responsive pleadings in 1967 and an informal conference between the parties and the Commission's staff was held in 1969, no formal Commission action had been taken by 1973.

On September 11, 1973 Ellwood filed a mandamus action in the United States District Court for the District of Columbia seeking an order compelling the Commission to investigate and take action upon the complaint. In November 1973, the Commission issued an order denying Penn Power's motion to dismiss the complaint and instituting an investigation. The mandamus action was then dismissed without opposition from Ellwood.

A hearing was held before an Administrative Law Judge in August 1974. In April 1975, the ALJ issued his decision dismissing Ellwood's complaint. Ellwood filed exceptions to this decision in May 1975. The Commission affirmed the ALH's decision on March 8, 1977 and denied an application by Ellwood for rehearing on April 29, 1977. Ellwood filed its petition for review

of the Commission's order on May 27, 1977. Penn Power's request to intervene has been granted.

## II. THE COMMISSION'S POWER TO PROMULGATE THE POLICY FORGIVING PAST FAILURES TO FILE

We must emphasize the context in which this case is being litigated. The Commission, as a result of the *Colton* decision, for the first time exercised jurisdiction over a large number of intra-state sales of power that had previously been subject only to state regulation. As a practical matter, the Commission was just beginning to regulate these transactions. In theory, however, these sales were always subject to the Commission's jurisdiction. The Commission thus was forced to formulate a policy regarding past as well as future sales. This policy was announced in Order No. 282. Essentially the Commission announced that it would excuse prior failures to file as long as current rates were promptly filed. The Commission, of course, did not foreclose the possibility that some third parties may be entitled to relief as a result of the past failures to file.

The issues confronting us here are whether it is within the Commission's power to promulgate the above policy and, if so, whether that policy may be applied to the sales in question here.

The Commission has promulgated similar policies when it began to exercise jurisdiction over other new categories of transactions. The most closely analogous situation occurred when the Commission first exercised jurisdiction, pursuant to the Supreme Court's decision in *California v. Lo-Vaca Gathering Co.*, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965), over sales of any natural gas actually commingled with gas to be resold in interstate commerce.

Although the Commission issued no general order on the subject, the Commission made clear its policy to forgive any failures to file prior to the Commission's own 1961 decision in *Lo-Vaca*.[3] The Commission approved settlements in the *Despot* proceedings that provided for no refunds for the period prior to 1961. *See* 38 F.P.C. 1041 (1967); 39 F.P.C. 232, 472, 555 (1968). In *Hugoton Production Co.*, 41 F.P.C. 490 (1969), the Commission refused to order refunds for pre-1961 sales stating:

> During the first period, before the issuance of *Lo-Vaca*, we are of the opinion that the doctrine of that case may not have been predictable by many producers. Under the doctrine we determined that sales of gas to a pipeline where the gas sold is commingled with the inter-state stream is jurisdictional, although by contract the producer and pipeline agree that the gas is to be used in the same state or used for compressor fuel and not resold. The Producers might have felt, with some reason, that gas could have been isolated from the jurisdictional gas by contractual means. Therefore, we think as a matter of equity Hugoton should not be required to make a refund for this period.

41 F.P.C. at 497. The Commission also declined to order refunds for pre-1961 transactions in *Plaquemines Oil and Gas Co.*, 43 F.P.C. 620 (1970), *rev'd in part on other grounds and remanded sub nom., Plaquemines Oil and Gas Co. v. F. P. C.*, 146 U.S.App.D.C. 287, 450 F.2d 1334 (1971). Unfortunately the District of Columbia Circuit's opinion in *Plaquemines*, although noting that the pre-1961 failure to file was excused, had no occasion to review the propriety of that action.

Another similar situation arose when the Supreme Court held, in *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), that producers and gatherers of natural gas who also transport or sell gas in interstate commerce for resale are subject to the requirements of the Natural Gas Act. In response, the Commission promulgated Order No. 174, 13 F.P.C. 1195 (1954), which was in turn modified by Order No. 174A, 13 F.P.C. 1410 (1954). The Commission explained the reason for promulgating the order in this way:

---

3. *Lo-Vaca Gathering Co.*, 26 F.P.C. 606 (1961).

Those producers and gatherers which come within the class found by the United States Supreme Court in the *Phillips* case to be subject to the Commission's jurisdiction should be afforded a reasonable opportunity to comply with the requirements of the Act to the end that the regulatory objectives of Congress may be achieved within the shortest feasible time. Also, in the interest of consumers, natural-gas companies and the public generally, practical considerations require us to deal with current problems which confront us as a consequence of the Court's decision and a reasonable cut-off date should be fixed in order to avoid confusion in attempting to readjust past transactions.

13 F.P.C. 1195. As a result of 174 and 174A, producers and gatherers were considered subject to the filing requirements of the Natural Gas Act only after June 7, 1954, the date of the Supreme Court decision in *Phillips*. In *Cities Service Gas Producing Co. v. F. P. C.*, 233 F.2d 726 (10th Cir. 1956), the court agreed with the Commission that an unfiled rate change made after June 7, 1954 by a company that had recently filed pursuant to Order No. 174A was ineffective. Thus, although the court did not specifically discuss whether the Commission could excuse pre-June 7 failures to file, it did emphasize that the attempted increase there was made after June 7. *Cities Service, supra*, at 730.

A third analogous situation arose involving the requirement of Section 23(b) of the Federal Power Act [4] that licenses be obtained to construct, operate or maintain power projects on navigable water. In the *Androscoggin* case, *Public Service Co. of New Hampshire*, 27 F.P.C. 830 (1962), the Commission predated licenses to begin to run from 1943, the date of earlier Commission decisions that made it clear that a stream usable for log transport was considered navigable. The significance of the effec-

tive date is that 20 years after the effective date each licensee must establish amortization reserves reflecting excess profits. These reserves may be used to reduce the amount which the U.S. must pay to take over the project after the license expires. Thus, the earlier the effective date, the worse for the company involved. By setting an effective date of 1943, the Commission, in effect, excused prior failures to apply for a license. Thereafter, the Commission established a policy of assigning 1962, the date of the *Androscoggin* decision, as the effective date for licenses sought under similar circumstances.[5] In *Niagara Mohawk Power Corp. v. F. P. C.*, 126 U.S. App.D.C. 376, 379 F.2d 153 (1967), the court affirmed the Commission's order pre-dating the effective date of such a license to 1962.

In all three situations described above, the Commission formulated policies for commencing the exercise of jurisdiction over previously unregulated transactions. In all three situations, the Commission, as part of its policy, decided to, in effect, excuse non-compliance with the regulatory scheme prior to a certain date. Unfortunately, the validity of this aspect of the Commission's policies has not been subjected to appellate review. In *Plaquemines, Cities Service* and *Niagara & Mohawk*, companies, who were essentially in the position of Penn Power here, claimed that the Commission had treated them too harshly. In those cases no one complained, as Ellwood does here, that the Commission was unlawfully lenient.

■ We conclude, however, that the Commission did act lawfully here. No statutory language prescribed the proper treatment for those who have in good faith failed to file.[6] Excusing the past failures to file here is justified by several factors. Most significant is that the past failures to file were the result of a widespread misapprehension of the extent of the Commis-

---

**4.** 16 U.S.C. § 817.

**5.** *See Niagara Mohawk Power Corp. v. F. P. C.*, 126 U.S.App.D.C. 376, 380, 379 F.2d 153, 157 (1967).

**6.** 16 U.S.C. § 825n provides for penalties in the case of *wilful* noncompliance.

sion's jurisdiction. Even the Court of Appeals in *Colton* shared this misapprehension. The failures to file were thus clearly in good faith. Since the companies were not culpable, they should not be punished for technical non-compliance.

Excusing past failures is also an incentive to present compliance. Finally, considerations of administrative practicality preclude requiring the Commission to search decades into the past in order to enforce every failure to comply with the regulatory scheme.

The Supreme Court has instructed us that the Commission "must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1958). Under these circumstances, we conclude that it was within the Commission's discretion, as part of its method of beginning to regulate the category of transactions in question here, to excuse past failures to file.

## III. THE APPLICATION OF THE COMMISSION'S POLICY TO PENN POWER

■ The question remains, however, whether a different result is required here because Penn Power did file rates in 1938. Ellwood contends that any amount charged in excess of the Rate Schedule No. 6 must be refunded under the filed rate doctrine. The filed rate doctrine is really not so much a judicially created "doctrine" as an application of explicit statutory language.

The doctrine has been applied under several regulatory schemes.[7] It has meant somewhat different things to different circuits. The doctrine has been described as intending "to prevent discriminatory rate payments",[8] as "reflecting a statutory bias in favor of retroactive rate reductions but not retroactive rate increases . . ."[9] and as being primarily concerned with the "preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant."[10]

The core of the filed rate doctrine, as it applies to electric utilities, is contained in the following sub-sections of § 205(c, d) of the Federal Power Act, 16 U.S.C. §§ 824d(c) and 824d(d):

(c) Under such rules and regulations as the commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will

---

7. See *City of Cleveland, Ohio v. Federal Power Commission*, 174 U.S.App.D.C. 1, 10, 525 F.2d 845, 854 (1976).

8. *Cities Service Gas Co. v. Federal Power Commission*, 424 F.2d 411, 417 (10th Cir. 1969), *cert. denied*, 400 U.S. 801, 91 S.Ct. 9, 27 L.Ed.2d 33 (1970).

9. *Gillring Oil Co. v. Federal Energy Regulatory Commission*, 566 F.2d 1323, 1325 (5th Cir. 1978).

10. *City of Cleveland, Ohio v. Federal Power Commission*, 174 U.S.App.D.C. 1, 525 F.2d 845, 854 (1976).

go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

The basic principle is simple: Since all rates subject to the Commission's jurisdiction must be filed and filed rates cannot be changed except as provided, utilities must sell their energy at the filed rate. This principle that rates cannot be changed except upon proper filing has been applied even where the initial rates had been agreed to between the parties, *but had not been filed.*[11]

Ellwood's theory is that the rate filed by Penn Power in 1938 based on the 1935–1940 contract was the only rate that Penn Power could charge until its 1964 filing and, therefore, that it is entitled to a refund of all amounts paid in excess of that rate. We hold that it is within the Commission's discretion to deny any refund on the facts here.[12]

As the Supreme Court stated in applying the Natural Gas Act, we must examine the details of Ellwood's argument "[ag]ainst the backdrop of the practical consequences of the petitioner's claim and the purpose of the Act . . . ." *Sunray Mid-Continent Oil Co. v. F. P. C.*, 364 U.S. 137, 147, 80 S.Ct. 1392, 1399, 4 L.Ed.2d 1623 (1960). The practical consequence of applying the filed rate doctrine in the manner suggested by Ellwood is that Penn Power would have the rate it charged Ellwood frozen for a period of twenty-four years after the 1935 contract, which set the rate, had terminated.

Ellwood claims that it should receive reimbursement in the amount of $312,465.

The purposes of the Act would not be furthered by such a result. The underlying concern of the Act is to assure that the rates subject to its coverage are reasonable and that these rates are set and reviewed in a fair and orderly manner. Penn Power did not escape regulation by not filing with the Commission between 1940 and 1964. Its sales to Ellwood were subject to regulation by the Pennsylvania Public Utilities Commission and all rate increases were filed with that agency.

Thus when Ellwood's argument is viewed against the backdrop of the practical consequences of its claim and the purposes of the Act, the force of the argument is considerably diminished.

With this in mind we now address directly the merits of Ellwood's filed rate contention. Ellwood argues that even if the policy embodied in Order No. 282 of forgiving past failures to file is valid, the sales here are outside the ambit of the policy because Penn Power filed a rate covering such sales in 1938. Presumably, according to this argument, if Penn Power had made a filing which cancelled this rate, the sales here would be within the scope of the policy enunciated in Order No. 282. In 1938, the Commission requested that Penn Power file the agreement on the basis of which the sales to Ellwood were made. Penn Power filed this agreement after being told that the filing of the rate itself was not proper. § 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d) prohibits changes in any "rate, charge, classification, or service, or in any rule, regulation or *contract* relating thereto" without proper filing. The con-

---

11. *See Borough of Lansdale, Pa. v. Federal Power Commission,* 161 U.S.App.D.C. 185, 494 F.2d 1104 (1974); *Natural Gas Pipeline v. Harrington,* 246 F.2d 915 (5th Cir. 1957), *cert. denied,* 356 U.S. 957, 78 S.Ct. 992, 2 L.Ed.2d 1065 (1958); *Cities Service Gas Producing Co. v. Federal Power Commission,* 233 F.2d 726 (10th Cir. 1956). The provisions of Section 4 of the Natural Gas Act, 15 U.S.C. § 717c, are essentially the same as those of Section 205 of the Federal Power Act. Cases decided under Sec-

tion 4 are therefore applicable here. *See Federal Power Commission v. Sierra Pacific Power Co.,* 350 U.S. 348–50, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

12. The Commission's position is that the filed rate doctrine does not limit its power and that it may always, after balancing the equities, deny refunds of excess charges. We need not decide whether the Commission's discretion is indeed this broad.

tract which was filed here, by its terms, terminated after five years. The current regulation, 18 C.F.R. § 35.15 (1977), requires filing with the Commission before "a rate schedule or part thereof required to be on file with the Commission is proposed to be cancelled or *is to terminate by its own terms.*" As late as 1961, this regulation then numbered 18 C.F.R. § 35.05 referred only to filing cancellations and did not specifically require filing where a contract, as the one here, terminated by its own terms. Since the statute requires filing of *changes*, and there was no change, and since the regulation applicable at the time the contract terminated did not require filing where a contract was terminated by its own terms, Penn Power properly considered the rate it filed in 1938 to be of no effect after 1940. We therefore hold that there was no effective filed rate applicable to the sales in question and, as a result, the filed rate doctrine is not applicable.

■ An alternative basis for this conclusion is that the filed rate doctrine provides no basis for distinguishing between companies who filed rates in the past and those who did not file at all. As already discussed, courts have held that where the Commission has jurisdiction over given sales and the parties have agreed to a certain rate, that rate may not be increased without prior filing even though the initial rate was never filed.[13] Ellwood therefore has no greater claim to a refund than does any other purchaser whose supplier's past failure to file is excused pursuant to Order No. 282. Thus if the Commission has the discretion under these circumstances to excuse past failures to file and we have just held that it does, the filed rate doctrine imposes no special obstacle to the exercise of that discretion with respect to Penn Power here.

The order of the Commission will, therefore, be affirmed.